Joel Shapiro, OSB #003814
joel@joelshapirolaw.com
Law Office of Joel Shapiro, LLC
1420 NW Lovejoy St, Suite 631
Portland, Oregon 97209
(971) 999-1889
One of the Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| A.B., an individual, | Case No.: 3:19-cv-1992 |
| Plaintiff, | |
| v. | FIRST AMENDED COMPLAINT<br>Trafficking Victims Protection Reauthorization Act (18 U.S.C. § 1595) |
| WYNDHAM HOTELS & RESORTS, INC.;<br>MARRIOTT INTERNATIONAL, INC.; and<br>RED LION HOTELS CORPORATION, | DEMAND FOR JURY TRIAL |
| Defendants. | |

**FIRST AMENDED COMPLAINT**

COMES NOW the Plaintiff A.B., by and through the undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

**INTRODUCTION**

1. For years, sex trafficking ventures have brazenly operated in and out of hotels throughout this country. Criminals parade their misconduct openly on hotel properties

FIRST AMENDED COMPLAINT                    1

throughout the United States while the hotels and hospitality industry continues to neglect the criminal misconduct to continue earning a profit at the expense of human life, human rights, and human dignity.

2.  All Defendants, including Wyndham Hotels & Resorts, Inc. (hereinafter "Wyndham"), Marriott International Inc., (hereinafter "Marriott"), and Red Lion Hotels Corporation (hereinafter "RLHC")[1] know and have known for more than a decade that sex trafficking repeatedly occurs under their flag throughout the country. Rather than taking timely and effective measures to thwart this epidemic, Defendant Hotels have instead chosen to ignore the open and obvious presence of sex trafficking on their properties, enjoying the profit from rooms rented for this explicit and apparent purpose.

3.  This action for damages is brought by the Plaintiff, a survivor of sex trafficking hereinafter identified by her initials A.B., under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA").

4.  A.B. was trafficked for commercial sex at the age of 22 years old in Oregon and Washington. In order to keep a roof over her head, she had to work for her share. A.B. was sold via commercial sex transactions at the Defendants' hotel properties through force, fraud, and coercion as the Defendants did nothing but profit.

5. Plaintiff first met her trafficker in what she believed to be the beginning of a romantic relationship.  Her trafficker used common methods of coercion, including complete control over her, humiliation, degradation, exhaustion, isolation, choking, incurrence of debt, and other methods to force compliance.

6. A.B. was advertised on www.backpage.com whereby the hotels in Salem and Portland,

---

[1] Collectively, Wyndham, Marriott, and RLHC may be referred to as "Defendant Hotels."

Oregon and Vancouver, Washington, including the Days Inn by Wyndham, Residence Inn by Marriott, Ramada by Wyndham, and Red Lion Hotel enabled, facilitated, and otherwise harbored A.B. for the purpose of sex trafficking.

7. As a direct and proximate result of Wyndham, Marriott, and RLHC's collective failure to act, mandate, establish, execute, and/or modify anti-trafficking efforts on their hotel properties, A.B. was sex trafficked, sexually exploited, and victimized repeatedly at Wyndham, Marriott, and and Red Lion brand hotels.

8. The Plaintiff brings this action pursuant to the Trafficking Victims Protection Reauthorization Act 18 U.S.C. §1595, against the Defendants who enabled, harbored, held, facilitated, or otherwise benefited, or any combination of the foregoing, from a sex trafficking venture in which A.B. was trafficked for sex, sexually exploited, and victimized in violation of the TVPRA

9.    Defendants knowingly benefited from participating in a venture they knew was engaged in illegal sex trafficking in violation of the TVPRA and engaged in acts and omissions that were intended to ignore signs of sex trafficking and support, facilitate, harbor, and otherwise further the trafficker's sale and victimization of her for commercial sexual exploitation.

10.    The specific conduct involved in Plaintiff's sexual exploitation along with the knowledge Defendants owned for decades about the prevalence and common signs of sex trafficking generally, should have alerted them to the signs and indicators that Plaintiff was being sex trafficked on their hotel properties.

11.    Defendants grossly failed and continue to fail to implement and effectuate policies and standards sufficient to combat sex trafficking throughout their hotel operations.

FIRST AMENDED COMPLAINT            3

**PARTIES**

12.    Plaintiff A.B. is a natural person who currently resides in Riverside, California. During the time she was trafficked for sex, she was a resident and citizen of Oregon.

   a.    Plaintiff A.B. was 22 years old when she was first sold for sex throughout Oregon and Washington for the purposes of commercial sex. The Plaintiff is a victim of trafficking pursuant to 22 U.S.C. §7102 (15) and 18 U.S.C. §1591 (a), and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C §7102 (14).

   b.    Due to the sensitive nature of the issues, Plaintiff A.B. requests this Court to grant a protective order pursuant to Federal Rule of Civil Procedure 26(c) to permit her to proceed under a pseudonym to ensure Defendants keep Plaintiff's identity confidential throughout the pendency of the lawsuit thereafter. [2]

   c.    Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties. [3] However, there are exceptions when the issues involved are of a sensitive and highly personal nature. [4] For good cause, the Court may issue an order to protect a party or person from annoyance,

---

[2] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[3] Fed. R. Civ. P. 10(a).

[4] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir. 1981); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

FIRST AMENDED COMPLAINT                    4

embarrassment, oppression, or undue burden or expense.[5]

d. Here, pseudonym status and to proceed under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears stigma from her family, friends, employer, and community if her true identity was revealed in the public record.

e. Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[6]

f. Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personally identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identities in a manner that will compromise her personal life or future employment prospects.

13.   Defendant Wyndham Hotels and Resorts, Inc. ("Wyndham") is one of the largest hotel brands in the world with nearly 9,000 branded properties in more than eighty (80) countries. It is a Delaware corporation and can be served by its registered agent, Corporate Creations Network, Inc., at 3411 Silverside Road, Tatnall Building Suite 104, Wilmington, Delaware 19810.

a. Defendant Wyndham Hotels and Resorts, Inc. is the successor entity to

---

[5] Fed. R. Civ. P. 26(c).
[6] *Supra* n. 2 at 1068 (the court joined its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

Wyndham Worldwide Corporation. Defendant Wyndham Hotels and Resorts, Inc. retains successor liability for wrongful acts of its predecessor Wyndham Worldwide Corporation.

b. Days Inn® by Wyndham ("Days Inn®") is a Wyndham Hotels and Resorts, Inc. brand property.

c. Ramada® by Wyndham ("Ramada®") is a Wyndham Hotels & Resorts, Inc. brand property.

d. Defendant Wyndham, Ramada® and the Days Inn® by Wyndham are single and joint employers with a high degree of interrelated, intermingled, and unified operations at the Days Inn® by Wyndham and Ramada by Wyndham hotels where the Plaintiff was trafficked for sex. Defendant Wyndham, Ramada® and the Days Inn® by Wyndham each share the common policies and practices complained of herein.

e. Defendant Wyndham, Ramada® and the Days Inn® jointly employ or ratify the employment of individuals through horizontal joint employment and or vertical joint employment.

f. As an integrated enterprise and or joint employer, Defendant Wyndham, Ramada® and the Days Inn® are separately and jointly responsible for compliance with all applicable laws.

g. As an integrated enterprise and or joint employer, Defendant Wyndham, Ramada® and the Days Inn® are jointly and severally liable for any damages caused by employees.

h. Upon information and belief, Defendant Wyndham controls a uniform and

required reservation and marketing system, credit processing system, training and policy on brand standards, including any policy or standards, or lack thereof, on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, or other hotel brand related policies published and communicated via property management systems with back-end management by Wyndham, Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at the Days Inn$_®$ and Ramada$_®$ hotels where A.B. was trafficked for sex.

i.  As a hotel operator and owner, Defendant Wyndham controls the training and human trafficking or other related policies, including decisions on implementation and execution of policy for its branded properties including the Days Inn$_®$ hotel where A.B. was trafficked.

j.  Through its relationship with the staff at the Days Inn$_®$ and Ramada$_®$where A.B. was trafficked and the perpetrator who trafficked A.B. at Days Inn$_®$ and Ramada$_®$ hotels while registered as a guest there, Defendant Wyndham knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking.

k.  Wyndham benefits financially from room rentals and other incidentals recognized throughrenting rooms at the brand property in which the Plaintiff

FIRST AMENDED COMPLAINT                 7

was sex trafficked.

l.   Wyndham owns, supervises, and/or operates the Days Inn® located at 9107 NE Vancouver Mall Drive Vancouver, WA 98662 and the Ramada® by Wyndham located at 6221 NE 82nd Ave, Portland, OR 97220.

14.   Defendant Marriott International, Inc. ("Marriott") is one of the largest hotel brands in the world. It is a Delaware corporation and can be served by its registered agent CT Corporation System, 780 Commercial Street SE, Suite 100, Salem, Oregon 97301.

a.   Residence Inn® by Marriott Portland Airport at Cascade Station ("Residence Inn®") is a Marriott brand property.

b.   Defendant Marriott and the Residence Inn® are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Residence Inn® hotel where the Plaintiff was trafficked for sex. Defendant Marriott and the Residence Inn® each share the common policies and practices complained of herein.

c.   Defendant Marriott and the Residence Inn® jointly employ or ratify the employment of individuals through horizontal joint employment and or vertical joint employment.

d.   As an integrated enterprise and or joint employer, Defendant Marriott and the Residence Inn® are separately and jointly responsible for compliance with all applicable laws.

e.   As an integrated enterprise and or joint employer, Defendant Marriott and the Residence Inn® are jointly and severally liable for any damages caused by employees.

f.  Upon information and belief, Defendant Marriott controls a uniform and required reservation and marketing system, credit processing system, training and policy on brand standards, including any standards, or lack thereof, on human trafficking, cybersecurity, guest preferences, internet access, reward programs, hotel furniture, amenities, food and beverage, cleanliness, or other hotel brand related policies published and communicated via property management systems with back-end management by Marriott, Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, including internet access logs, filtering and/or other guest protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at the Residence Inn® hotel where A.B. was trafficked for sex.

g.  Defendant Marriott maintains that it considers guest safety and security to be important and requires the hotels in its portfolio to comply with Marriott brand standards and all local, state, and federal laws.

h.  Through its relationship with the Residence Inn® hotel where A.B. was trafficked and the perpetrator who trafficked A.B. at the Residence Inn® hotel. Defendant Marriott knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking.

i.  Marriott benefits financially from room rentals and other incidentals recognized through renting rooms at the brand property in which the Plaintiff was sex trafficked.

FIRST AMENDED COMPLAINT                          9

j.  Marriott owns, supervisors, and/or operates the Residence Inn® located at 9301 NE Cascades Parkway, Portland, Oregon 97220.

15.  Defendant Red Lion Hotels Corporation ("RLHC") is a large hotel brand. It is an Oregon corporation and can be served by its registered agent Corporate Creations, 5708 SE 136th Avenue, Suite 2, Portland, Oregon 97236.

a.  Red Lion® is a RLHC brand property.

b.  Defendant RLHC and the Red Lion® hotel are a single and joint employer with a high degree of interrelated, intermingled, and unified operations at the Red Lion® hotel where the Plaintiff was trafficked for sex. Defendant RLHC and the Red Lion® hotel each share the common policies and practices complained of herein.

c.  Defendant RLHC and the Red Lion® hotel jointly employ or ratify the employment of individuals through horizontal joint employment and or vertical joint employment.

d.  As an integrated enterprise and or joint employer, Defendant RLHC and the Red Lion]® hotel are separately and jointly responsible for compliance with all applicable laws.

e.  As an integrated enterprise and or joint employer, Defendant RLHC and the Red Lion® hotel are jointly and severally liable for any damages caused by employees.

f.  Upon information and belief, Defendant RLHC controls a uniform and required reservation and marketing system, credit processing system, training and policy on brand standards, including any standards, or lack thereof, on

FIRST AMENDED COMPLAINT          10

human trafficking, cybersecurity, guest preferences, rewards programs, hotel furniture, amenities, food and beverage, cleanliness, or other hotel brand related policies published and communicated via property management systems with back-end management by RLHC, Wi-Fi qualifications and/or Wi-Fi qualified vendor providers, language and policy used on internet landing pages, thresholds for cybersecurity, including internet access logs, filtering and/or other guest protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at the Red Lion® hotel where A.B. was trafficked for sex.

g.  Defendant RLHC maintains that it considers guest safety and security to be important and requires the hotels in its portfolio to comply with RLHC brand standards and all local, state, and federal laws.

h.  Through its relationship with the Red Lion® hotel where A.B. was trafficked and the perpetrator who trafficked A.B. at the Red Lion® hotel while registered as a guest there. Defendant RLHC knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking.

i.  RLHC benefits financially from room rentals and other incidentals recognized through renting rooms at the brand property in which the Plaintiff was sex trafficked.

j.  RLHC owns, supervises, and/or operates the Red Lion® hotel located at 3301 Market Street NE Salem, Oregon 97301.

16.  Whenever reference is made in this Complaint to any act, deed, or conduct of the

Defendants, the allegation is that the Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendants.

## JURISDICTION AND VENUE

17.     This Honorable Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States.

18.     Furthermore, this Honorable Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) based on complete diversity of citizenship between Plaintiff and all Defendants. The amount in controversy exceeds $75,000.

19.     Venue is proper in this District Court as this District Court is a judicial district where Defendants are subject to personal jurisdiction in accordance with 28 U.S.C. § 1391(b)(3).

20.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action, including the Defendants' misconduct and omissions, occurred in the judicial district where this action is brought.

21.     Defendants have submitted to the jurisdiction of Oregon and have purposefully availed themselves of the privilege of conducting acts in Oregon through their dominion and control over their respective brands with brand subsidiaries, brand property subsidiaries, and operating hotels, and day-to-day operation of the hotels, and thus, invoking the benefits and protections of the laws in Oregon; Oregon has an equally strong interest in protecting and

assuring the safety of persons within its State.[7]

<u>**SEX TRAFFICKING UNDER FEDERAL LAW**</u>

22.     The requirements for liability under TVPRA § 1595 on a beneficiary theory can be stated as follows: (1) the person or entity must "knowingly benefit[], financially or by receiving anything of value," (2) from participating in a venture, (3) that the "person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a).

23.     Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion."  This definition combines the three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

24.     To best understand the mechanism by which sex trafficking ventures are prohibited by federal criminal law, it's best to address these elements in the reverse. Sex trafficking is slavery for the *purpose* of commercial sex, a lens on the already existing crimes prohibited by 18 U.S.C. § 1589 and §1590. The crime of slavery can then be divided into the two (2) elements remaining: the act and the means. The *act* is the "harboring, transporting, providing, or obtaining," of forced labor, codified as a violation of 18 U.S.C. §1590, while the *means* is labor "obtained or provided by force, fraud or coercion" and is codified as a violation of 18 U.S.C. §1589.

25.     Thus, while the complete definition of 'sex trafficking' is found in the TVPRA

---

[7] Portland, Oregon has a reputation as a national hub for sex trafficking. *See* Michal Elseth, Portland's Dark World of Child Sex Trafficking, THE WASHINGTON TIMES (Jul. 28, 2010), *available at* https://www.washingtontimes.com/news/2010/jul/28/portlands-dark-world-of-child-sex-trafficking/; see also Laura McVicker, Child Sex Trafficking on Rise in Clark County, THE COLUMBIAN (Nov. 14, 2011), *available at* https://www.columbian.com/news/2011/nov/15/child-sex-trafficking-on-rise-crime-upcoming-indus/.

under 22 U.S.C. § 7102, and it is specifically prohibited under 18 U.S.C. § 1591, it is nevertheless a long- recognized and familiar atrocity.

## FACTUAL ALLEGATIONS

### A.  THE HOSPITALITY INDUSTRY'S PARTICIPATION IN THE SEX TRAFFICKING INDUSTRY

*"75% of survivors responding to Polaris's survey reported coming into contact with hotels at some point during their exploitation… Unfortunately, 94% also disclosed that they never received any assistance, concern, or identification from hotel staff."*

*-The Polaris Project[8]*

26.    Human trafficking is the world's fastest growing crime.[9] While the term 'human trafficking' incorporates all forced labor, the sex trafficking industry alone pulls in an estimated $99 billion each year making it the second largest illicit crime industry behind only the sale of ***all*** illegal drugs.[10]

27.    Sex traffickers, or 'pimps', use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

28.    The hospitality industry plays a crucial role in the sex trade.[11] The trope of the "no-tell motel" is certainly not a new one. Hotels have long profited from their reputations as havens of privacy and discretion for the offending. Hotels offer anonymity and non-traceability, making them ideal venues for crime and sex trafficking in particular.

---

[8] *Recommendations for Hotels and Motels*, THE POLARIS PROJECT,
https://polarisproject.org/hotels-motels-recommendations (last visited June 19, 2019).
[9] *Human Trafficking is the World's Fastest Growing Crime*, THE ADVISORY BOARD (May 22, 2017, 9:30 AM),
https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking.
[10] *Profits and Poverty: The Economics of Forced Labor*, INTERNATIONAL LABOR ORGANIZATION (May 24, 2014), http://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_243391/lang--en/index.htm.
[11] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017),
http://scholarship.sha.cornell.edu/honorstheses/3.

FIRST AMENDED COMPLAINT                14

29.     According to National Human Trafficking Hotline statistics, hotels are the top-reported venue, even over commercial front brothels, where sex trafficking acts occur.[12] Traffickers and buyers alike frequently use hotel rooms to exploit victims.

30.     Traffickers use hotels as the hub of their operations. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex.  This is referred to as an "in call."

31.     Hotels are also the venue of choice for buyers seeking an "out call," wherein the buyer rents a hotel room and the trafficker delivers the victim to the buyer's room to complete the sordid transaction. Unsurprisingly, those on the demand side of this transaction (i.e., those purchasing sex) typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels. In New York City alone, 45% of all reported sexual exploitation took place in hotels, including the Ritz Carlton and the Plaza.[13]

32.     The problem is industry wide. In the United States, as much as 63% of all trafficking incidents happen in hotels ranging from luxury to economy.[14]

33.     Due to the overall complacency of the hospitality industry on addressing the issue, hotels are *the* venue of choice for sex trafficking.[15] Traffickers and buyers capitalize on the hotel industry's general refusal to adopt and enforce company-wide anti-trafficking policies from the corporate to the property level, train staff on what to look for and how to

---

[12] *National Human Trafficking Hotline Statistics*, THE POLARIS PROJECT (2016), https://polarisproject.org/resources/2016-hotline statistics.
[13] Giovanna L. C. Cavagnaro, *Sex Trafficking: The hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[14] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).
[15] *Hotels Initiative*, THE POLARIS PROJECT, https://polarisproject.org/initiatives/hotels (last visited June 19, 2019).

FIRST AMENDED COMPLAINT                    15

respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.

34.     Every day, thousands of hotel employees witness manifestations of sex trafficking and commercial exploitation. Thus, the hospitality industry has the greatest reach to prevent, identify and thwart sexual exploitation where it is most likely to occur. [16]

35.     But aside from their unique position in this epidemic, hotels and motels have the highest obligation to protect their guests from known dangers, including sex trafficking and sexual exploitation, and should be held accountable when they fail to comply. As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry… and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so."[17]

36.     Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a critical and obvious legal obligation for the hospitality industry. The presence of sex trafficking and sexual exploitation in a hotel is frequently an obvious occurrence and, although unutilized, underutilized, or ineffectively utilized, numerous well-researched trainings and toolkits have been published to the hotel industry over the last decade to help hotel staff in every position to identify the signs.[18]

37.     From check-in to check-out there are a number of indicators that traffickers and their victims exhibit during their stay at a hotel. With proper training and the

---

[16] *Combating Human Trafficking in the Hotel Industry*, HUFFPOST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_7840754 (last visited November 18, 2019).
[17] Giavanna L. C. Cavagnaro, *Sex trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.
[18] DEPARTMENT  OF HOMELAND SECURITY, *Blue Campaign Toolkit*, attached as "Exhibit A." Available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

FIRST AMENDED COMPLAINT                    16

implementation of reasonable security measures, hospitality companies could prevent regular sex trafficking under their flag.

38.    There are many signs of sex trafficking. Though some are discreet by nature, under attentive and well-trained hotel operators, such signs would prompt action or would have been prevented in the first place under proper policies and procedures. These signs include, but are certainly not limited to: paying with cash, an excess of condoms in rooms, individuals carrying or flashing large amounts of cash, excessive amounts of cash stored in the room, renting two (2) rooms next door to each other, declining in-room service for several consecutive days, ordering additional towels and sheets at varying times, significant foot traffic in and out of room(s), men traveling with multiple women who appear unrelated, or men who rent rooms for someone else, women known to be staying in rooms without leaving, women displaying physical injuries or signs of fear and anxiety, guests checking in with little or no luggage, hotel guests who prevent another individual from speaking for themselves, or a guest controlling another's identification documents.[19]

39.    Obviously, hotel staff who have undergone training are more aware of sex trafficking when it happens and are more willing to report it than hotel staff who have not been trained.[20] Thus, hospitality companies are obligated to adopt policies and procedures related to sex trafficking and to enforce these policies and procedures as brand standard through to the property level.

40.    In 2011, Wyndham Hotels publicized that it was beginning training of some of its

---

[19] *Id*. See also, Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, THE INSTITUTE TO ADDRESS CRIMINAL SEXUAL EXPLOITATION, Villanova University School of Law (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.
[20] Giavanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

FIRST AMENDED COMPLAINT                    17

employees to look for signs of trafficking.[21]

41.    Hospitality companies can and should mandate that *all* staff working at *all* hotel properties across their brand complete sex trafficking training.[22]

42.    The hospitality industry has been cognizant of their role and responsibilities in the sex trafficking industry for years.

43.    At the General Assembly of the United Nations ("UN") convened in New York, New  York in November 2000, the Palermo Protocol to prevent, suppress, and punish trafficking in persons was adopted.[23]

44.    In this regard, End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States in 2004.[24]

45.    The Code identifies the following six (6) steps companies can take to prevent child sex trafficking: (1) establish corporate policy and procedures against sexual exploitation of children; (2) train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases; (3) include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children; (4) provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases; (5) support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and (6) report annually on the company's implementation of Code-related activities.

---

[21] Katie Lobosco, Super 8 workers trained to spot sex trafficking, CNN BUSINESS (Nov. 18, 2014), https://money.cnn.com/2014/11/18/news/companies/days-inn-sex-trafficking/.
[22] Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, The Institute to Address Criminal Sexual Exploitation, Villanova University School of Law (2015), https://cseinstitute.org/wp- content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.
[23] Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children, supplementing the United Nations Convention against Transnational Organized Crime, *adopted* Nov. 15, 2000, 2237 U.N.T.S. 319.
[24] ECPAT-USA, *No Vacancy For Child Sex Traffickers Impact Report* (2017), *available at*: https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/59c9b6bfb07869cc5d792b8c/1506391761747/NoVacany_Report.pdf.

FIRST AMENDED COMPLAINT                18

46.    ECPAT-USA also identifies hotel-specific best practices for preventing sex trafficking, including but not limited to:[25]

      a.      Develop a formal policy against trafficking;

      b.      Develop a protocol for response;

      c.      Conduct periodic training on indicators;

      d.      Not renting by the hour;

      e.      Not permitting cash payments;

      f.      Blocking "internet access to popular websites for online sex ads,"

      g.      Monitoring "online sex ads such as Craigslist and Backpage for your hotel name and pictures of your rooms and guests";

      h.      Change wi-fi passwords in rooms and cafes regularly;

      i.      Require all visitors are logged, including guest name, visitor name, arrival time, departure time, and room number;

      j.      Actively greet and speak with all visitors arriving at night;

      k.      Watch for a trend of visitors to the same room;

      l.      Be aware of rooms with excess condoms, lubricants, and towels and Report these indicators to management;

47.    In 2010, www.backpage.com became the leader in the advertisement of "adult services," generating annual revenue of approximately $150,000,000.00 and approximately $3,100,000.00 from sex advertisements in just one week.[26] Between January 2013 and

---

[25] ECPAT-USA, ECPAT-USA Anti-Trafficking Hotel Checklist, available at
https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/5cd329e8a4222f20baf5378b/1557342696892/
ECPAT-USA_AntiTraffickingHotelChecklist.pdf.
[26] *See e.g.*
http://www.chicagotribune.com/business/ct-backpage-raided-ceo-carl-ferrer-arrested-20161006-story.html;
https://www.nytimes.com/2016/10/07/us/carl-ferrer-backpage-ceo-is-arrested.html?_r=0; and
https://www.washingtonpost.com/news/morning-mix/wp/2016/10/07/ceo-of-backpage-called-worlds-top-online-brot
hel-arrested-on-pimping-charges/?utm_term=.bbcf8b9dcb10.

March 2015, ninety-nine percent (99%) of global income related to or arising from www.backpage.com was derived from the website's "adult section," including advertisements sexually exploiting children. Backpage has been called the "World's Top Online Brothel."[27]

48.    The United States Senate Permanent Subcommittee on Investigations issued a staff report in January 2017 (hereinafter "Senate Report") entitled "Backpage.com's Knowing Facilitation of Online Sex Trafficking" that summarizes the role ww.backpage.com has played in the burgeoning criminal industry of sex trafficking, in which www.backpage.com does not deny that the website is used for criminal activity, including the sex trafficking of children.[28]

49.    According to the January 2017 Senate Report, Backpage is involved in 73% of all child trafficking reports that the National Center for Missing and Exploited Children (NCMEC) receives from the general public (excluding reports by Backpage itself).[29]

50.    One of the principle findings of the Senate Report is that Backpage knows that it facilitates prostitution and child sex trafficking: "Backpage moderators told the Subcommittee that everyone at the company knew the adult-section ads were for prostitution and that their job was to "put[] lipstick on a pig" by sanitizing them…[and] the company has often refused to act swiftly in response to complaints about particular underage users—preferring in some cases to interpret these complaints as the tactics of a competing escort."[30]

---

[27] *Id.*
[28] *See*
http://www.portman.senate.gov/public/index.cfm/files/serve?File_id=5D0C71AE-A090-4F30-A5F5-7CFFC08AFD
48. Additionally, a copy of the full Senate Report plus its appendix can be accessed online at:
https://www.hsgac.senate.gov/subcommittees/investigations/reports.
[29] *Id.*
[30] *See id.*

FIRST AMENDED COMPLAINT                    20

51.    In April 2018, Carl Ferrer, the chief executive of Backpage.com, plead Backpage guilty to human trafficking of a teenaged girl, and money laundering by concealing the proceeds from facilitating criminal activity.[31]

52.    In 2010, the United States government released its Trafficking in Persons Report, which included an assessment of trafficking in the United States. The Trafficking in Persons Report 2010 stated that approximately 12.3 million adults and children were in forced labor, bonded labor, and force prostitution around the world, but that only 4,166 trafficking prosecutions were successful in 2009.[32]

53.    During a speech in New York City in September 2012, President Obama stated that human trafficking "ought to concern every person, because it is a debasement of our common humanity. It ought to concern every community, because it tears at our social fabric. It ought to concern every business, because it distorts markets. It ought to concern every nation, because it endangers public health and fuels violence and organized crime."[33]

54.    Statistics released in 2014 by the International Labor Organization ("ILO") showed that approximately 4.5 million people were victims of forced sexual exploitation globally and that the violation of their human rights yielded an estimated annual profit of $99 billion dollars for sex traffickers worldwide.[34] Put another way, the numbers showed that a sex trafficker's annual profit per victim was approximately $22,000.00.[35]

---

[31] *See* Jackman, *Backpage CEO Carl Ferrer pleads guilty in three states, agrees to testify against other website officials*, The Washington Post (April 13, 2018) *available at* https://www.washingtonpost.com/news/true-crime/wp/2018/04/13/backpage-ceo-carl-ferrer-pleads-guilty-in-three-states-agrees-to-testify-against-other-website-officials/.

[32] CNN Wire Staff, *U.S. human trafficking report includes U.S. cases for first time*, CNN.com (Jun. 14, 2010), available at https://www.cnn.com/2010/US/06/14/human.trafficking/index.html#.

[33] President Barack Obama, Remarks to the Clinton Global Initiative (Sept. 25, 2012), *available at* https://obamawhitehouse.archives.gov/the-press-office/2012/09/25/remarks-president-clinton-global-initiative.

[34] International Labour Office, *Profits and Poverty: The Economics of Forced Labour* (2014), at 13, *available at* https://www.ilo.org/wcmsp5/groups/public/---ed_norm/---declaration/documents/publication/wcms_243391.pdf.

[35] *Id.* at 15.

FIRST AMENDED COMPLAINT          21

55.    A scholarly article published in 2015 estimated that pimps could earn $25,000.00 to $33,000.00 per week selling in the Atlanta, Georgia area.[36] This volume of and profit from sex trafficking also aligned with internet advertising for the sex trafficking industry occurring in roughly the same time period. For example, in 2015, one advertisement in the Atlanta section of the www.backpage.com website triggered 181 clients, and calls or texts from twenty-seven (27) men expressing interest – in a span of just ninety (90) minutes.[37]

56.    In December 2015, President Obama appointed eleven (11) survivors of human trafficking to the inaugural United States Advisory Council on Human Trafficking to advise and make recommendations on federal anti-trafficking policies to the President's Interagency Task Force to Monitor and Combat Trafficking in Persons.[38]

57.    The United States Department of Justice ("DOJ") brought 248 sex trafficking prosecutions in Fiscal Year 2015 and secured convictions against 291 sex traffickers.[39] In the previous year, DOJ convicted a total of 184 human traffickers (inclusive of labor trafficking) and in the subsequent year, DOJ convicted a total of 439 human traffickers (inclusive of labor trafficking).[40]

58.    Despite these efforts of governmental and non-governmental organizations to combat human trafficking, the hospitality industry as a whole, continued to lag behind in its efforts to prevent human trafficking. A 2015 study showed that forty-five percent (45%) of children who suffered sexual exploitation report that the sexual exploitation took place in a hotel.[41]

---

[36] Sarkisian, supra n.14, at 4.
[37] Id. at 5.
[38] U.S. Dep't of State, *2016 Trafficking in Persons Report* (2016), at 41, *available at* https://www.state.gov/documents/organization/258876.pdf.
[39] Id. at 389.
[40] Human Rights First, *Fact Sheet 2017* (2017), *available at* http://www.humanrightsfirst.org/sites/default/files/TraffickingbytheNumbers.pdf.
[41] Sarkisian, *supra* n.14.

FIRST AMENDED COMPLAINT                     22

59.     Even estimates by attorneys *for the* hospitality industry indicate that eight (8) out of ten (10) arrests for human trafficking occur in or around hotels.[42] The 2016 Trafficking in Persons Report issued by the United States Department of State also confirmed that human trafficking occurs in the hospitality industry in the United States.[43]

60.     Between 2007 and March 2015, more than 1,400 human trafficking cases have been reported to the National Trafficking Resource Center.[44]

61.     The complicity of the hospitality industry is essential to the perpetuation of human trafficking, allowing traffickers to remain transient, collect profits, and evade detection. Sex trafficking ventures move from place to place so that they are less visible to law enforcement. Similarly, sex traffickers also want to keep their victims moving from place to place to isolate them from any possible means of escape or rescue. Traffickers are well aware of the seclusion and anonymity attendant with booking rooms with hotel chains – they know it is unlikely that they will be disturbed.

62.     Due to the hospitality industry's failure to embrace anti-trafficking policies and practices, children and other vulnerable persons are trafficked for sex in hotels throughout the United States.

63.     Further, nationwide campaigns recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue, and took initiative as early as 1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[45] These efforts sought to educate

---

[42] Rich Keating, *Human Trafficking: What It Is And How It Impacts The Hospitality Industry*, Presentation Delivered At AHIA Sprint Conference 2013, Washington, D.C., *available at* http://www.ahiattorneys.org/aws/AHIA/asset_manager/get_file/92983 (last visited Mar. 1, 2019).
[43] U.S. Dep't of State, *supra* n.38, at 387.
[44] Polaris, *Human Trafficking and the Hotel Industry* (2015), *available at* https://polarisproject.org/resources/human-trafficking-and-hotel-industry.
[45] *DHS Blue Campaign Five Year Milestone*, DEPARTMENT OF HOMELAND SECURITY (Jul. 22, 2015), https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

FIRST AMENDED COMPLAINT                    23

both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released online resources and toolkits publicly accessible to any entity concerned with human trafficking.[46]

64.    Defendants agree that human trafficking is a problem globally, but not one brand admits that human trafficking is a problem in their business at their brand locations.

65.    Defendants' "solution" to the problem " to the problem of human trafficking is always the same—to give lip service about more employee training, and to identify some red flags related to trafficking. But this employee training has never really occurred *en masse*. For instance, according to the reporting in ECPAT's reports, the actual number of employees trained is abysmal. Moreover, although the training may provide some information in identifying trafficking, it provides no clear message on training that will serve to actively address or prevent human trafficking.

66.    Upon information and belief, reports by the Polaris Project were received and reviewed by the executives, directors and managers of Wyndham, Marriott, and RLHC.

67.    To curry more favor with the public, Defendants together, most often through state and national associations like the American Hotel & Lodging Association ("AHLA")[47] —where Defendants are all members[48] —advertise policies, practices, and procedures that

---

[46] *Human Trafficking and the Hospitality Industry*, DEPARTMENT OF HOMELAND SECURITY, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited June 19, 2019).

[47] For more than 100 years, AHLA has been the foremost representative and advocate for the U.S. lodging industry and the only national association that represents all segments of an industry that is among the 10 largest business sectors in America. From major global brands to the small inns and bed & breakfasts, AHLA provides a singular voice that brings together the industry's multitude of constituents. AHLA is diverse and represents everyone from brand CEOs to independent hotel owners, general managers, and hotel staff and is an integral contributor to the American economy. *See* American Hotel & Lodging Association, Who We Are, *available at* https://www.ahla.com/who-we-are (last visited Apr. 22, 2020).

[48] *See* American Hotel & Lodging Association, Our Members, *available at* https://www.ahla.com/our-members.

FIRST AMENDED COMPLAINT               24

indicate a unified commitment to fighting human trafficking.[49]

68.     Hospitality companies have both the power and responsibility to make sex trafficking difficult for the offenders. Yet, they either repeatedly failed and continue to fail to heed the call or to execute their own policies. Instead, each continues to facilitate these crimes at their hotels, content to direct their efforts solely to profit and the bottom line.

## A.    THE DEFENDANTS CONTROL THE HOSPITALITY INDUSTRY

69.     Hotel brands or flags lend their name and likeness to third party owners, while the building and operations are run by a franchisee or a third party management company under the brands' control. In return, the parent brand exchanges the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a franchise contract and still profits from putting heads in beds.

70.     The average consumer does not see this relationship. The parent brand gives the franchisee property its identity. It provides signage on and in front of the building that assures customers that if they check into that hotel they can expect the standards consistent with the parent hotel brand. The same brand emblazoned on everything in the hotel from the pens in the bedside tables to the staff uniforms at the front desk.

71.     In addition to brand recognition, a marketing organization, hotel listings in the Global Distribution System (GDS) and other online travel agency databases, the brand provides the franchise hotel with access to its brand wide central reservation system, 800 number, revenue management tools, world-class loyalty programs and a website. Thus, booking and room reservations are controlled by the corporate parent brand.[50]

---

[49] *See, e.g.*, NICHOLS, ANDREA J., SEX TRAFFICKING IN THE UNITED STATES (2016) (citing American Hotel and Lodging Association. 2012. "Industry Principles to Combat Human Trafficking."
[50] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (April 10, 2018) https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/.

FIRST AMENDED COMPLAINT          25

72.    The franchise hotel typically pays around 10% of their total revenue back to the parent hotel brand and is required to develop and maintain the property in accordance with the parent brand's standards as they are laid out in the franchise agreement.

73.    Per the franchise agreement, the parent brand may enforce these standards through periodic inspections and even termination of the franchise agreement if the franchise hotel is found to be inadequate. The right of the parent hotel brand to enforce their brand standards is also their responsibility.

74.    At the time of the incidents alleged herein:

    a.  Defendant Wyndham owned and controlled the Days Inn$_{®}$ and Ramada$_{®}$ brands.

    b.  Defendant Marriott owned and controlled the Residence Inn$_{®}$ brand.

    c.  Defendant Red Lion Hotels Corporation owned and controlled the Red Lion Inn$_{®}$ brand.

75.    Parent hotel brands may kick delinquent hotels out of their system but it is at the expense of terminating their royalty payments.

76.    Defendants magnify their influence and control over the hospitality industry through their membership and activity in trade associations such AHLA.

77.    Upon information and belief, all Defendants are members of AHLA, and Defendants Wyndham and Marriott have served on executive committees or as board members in AHLA,[51] or other state and national associations since at least 2008.[52]

78.    The AHLA serves as a forum for the Defendants to discuss efforts related to

---

[51] *See* https://www.ahla.com/press-release/ahla-announces-2020-officers-board-executive-committee-amid-record-membership.

[52] *See* American Hotel & Lodging Association, Partner State Associations, *available at* *https://www.ahla.com/psa*.

FIRST AMENDED COMPLAINT            26

human trafficking and serves as a voice from which the Defendants can address the issue with the public.

79.     Through national hotel industry trade associations, Defendants disseminated very specific talking points to provide to the government, law enforcement, the public, and the media. These talking points amounted to nothing but spin whereby defendants tote themselves as heroes. These were more than advertising campaigns. They were part of a concerted effort to divert the attention of anti-trafficking stakeholders and lawmakers away from the brands and assure them that the hotel industry, and Defendants specifically, were meaningfully addressing the industry-wide problem of human trafficking. By representing to the public and to legislators "the industry's ongoing commitment and work to end human trafficking"  the Defendants assumed the responsibility of meaningfully addressing human trafficking at their branded properties.[53]

80.     Upon information and belief, between at least 2008 to 2013 Defendant Wyndham held meetings among its executives, directors, and managers at which sex trafficking in its hotels was discussed.

81.     Upon information and belief, between at least 2008 to 2013, Defendant Marriott held meetings among its executives, directors, and managers at which sex trafficking in its hotels was discussed.

82.     Upon information and belief, between at least 2008 to 2013, Defendant RLHC held meetings among its executives, directors, and managers at which sex trafficking in its hotels was discussed.

83.     Upon information and belief, between at least 2008 to 2013 Defendants held meetings through its trade organizations in which sex trafficking in its hotels was discussed.

---

[53] *See* https://www.ahla.com/issues/human-trafficking.

84.     Upon information and belief, during at least the 2008 to 2013 time period, emails were exchanged by employees of the Defendants' respective brands that related to sex trafficking in hotels including Defendants' hotels.

85.     As industry leaders, Defendants each failed to articulate policy, process, or procedure that would measure the extent of the trafficking problem at their branded locations. They essentially all allowed their colleague brands to perpetuate the lie that sex trafficking was not a problem on their brand properties. Moreover, Defendants did not articulate a policy, process, or procedure that could measure whether the "employee training" had the effect of reducing instances or expected instances of human trafficking.

86.     Hotel Defendants collectively declined to implement policies that would likely have the effect of reducing the billions of dollars in sex trafficking profits. As a whole, Defendants did not call for stricter room rental requirements. For example, Defendants did not require ID or names of every person staying in the room; did not limit the number of people allowed to stay in a room; did not require a credit or debit card to be placed on file with a name on it (accepting prepaid credit cards and even cash), and did not monitor reservation patterns maintained and owned by their brand central reservation systems, data of which could only be analyzed by the brand Defendant with backend access.  In short, Defendants refused to communicate to traffickers "your business and your money are not welcome here."

87.     Through this coordinated effort, Defendants were able to rest assured they would not have to implement effective policies and procedures. Given that human trafficking does more than $100 billion in business a year and the fact that a large percent of all trafficking ventures occur at hotels and motels—there can be no doubt that Defendants, as an industry,

generate billions of dollars every year from human trafficking ventures.

88.    Defendants' coordinated efforts created an industry phisaud that steps were being taken to to combat human trafficking while in practice implementing nothing meaningful or effective. Defendants guaranteed that they would not have to compete with a national branded property that put together a policy that eliminated trafficking from their branded properties. While it would be challenging and expensive (both business expenses and lost revenues from traffickers or commercial sex) to implement effective policies, it is apparent that an effective policy would create a long term competitive advantage for the individual defendant. In short, a business that implemented an effective policy could easily provide reportable data on how it reduced trafficking at its brand properties. Moreover, it could exploit the fact that other defendants are completely ignoring that a problem exists at their brand properties. The complying hotel could explain how other brand hotels will never be able to effectively battle the problem until they admit it exists on their properties. Thus, in the long run, an effective policy would generate public support and create brand loyalty, resulting in greater revenues and profits.

## B.  THE DEFENDANTS' ACTUAL AND/OR CONSTRUCTIVE KNOWLEDGE OF SEX TRAFFICKING AT THEIR HOTELS

89.    Defendants Wyndham, Marriott, and RLHC ("Defendant Hotels") have been on notice of repeated incidences of sex trafficking occurring at their Days Inn, Ramada, Residence Inn, and Red Lion hotels yet these parent or brand managers failed to take the necessary action to combat sex trafficking and still persist in failing to take the necessary action to prevent sex trafficking at their hotels.

90.    Several courts have found failure to implement policies sufficient to combat a known

problem in one's operations can rise to the level of willful blindness or negligence.[54]

91.  WYNDHAM HOTELS AND RESORTS, INC. ("WYNDHAM"):

   a.  For years Defendant Wyndham has been on notice of repeated incidences of sex trafficking occurring on its Days Inn® by Wyndham and Ramada® by Wyndham branded properties, yet Defendant Wyndham has failed to take action to prevent sex trafficking at Days Inn® by Wyndham and Ramada® by Wyndham brand properties and still persists in failing to take necessary action to prevent sex trafficking on its properties. Defendant Wyndham's inattention in this regard enabled and contributed to the sex trafficking the Plaintiff suffered at the Days Inn® by Wyndham and Ramada® by Wyndham hotels.

   b.  There are numerous examples across place and time of Defendant Wyndham's knowledge of sex trafficking on its branded properties and its continued, total inattention to preventing and remedying the blight of human trafficking on the lives and liberties of its victims.

   c.  Upon information and belief, Plaintiff alleges that Wyndham implemented means in which it could and did monitor various customer reviews about its branded properties, including reviews related to prostitution, sex trafficking, and guest safety issues.

   d.  In 2011, Defendant Wyndham's predecessor entity Wyndham Worldwide Corporation, signed the ECPAT Code, but as evidenced by the widespread sex trafficking which continued to occur at Defendant Wyndham's branded properties, Defendant Wyndham did not practice what it preached. Defendant

---

[54] *See Brown v. Corr. Corp. of Am.*, 603 F.Supp.2d 73, 81 (D.D.C. Mar. 26, 2009); *Trollinger v. Tyson Foods, Inc.*, 2007 WL 1574275, at *12 (.E.D. Tenn. May 29, 2007).

FIRST AMENDED COMPLAINT            30

Wyndham's adoption of the ECPAT Code appears to have been nothing more than a strategic maneuver through which it sought a shield against liability but not a sword against human trafficking.

e.  Despite Defendant Wyndham's anti-trafficking stance, Defendant Wyndham failed to implement and enforce any of its own policy or policies including with respect to the Days Inn® by Wyndham and Ramada® by Wyndham. Defendant Wyndham knew or should have known that the Days Inn® by Wyndham and Ramada® by Wyndham were located in areas known for sex trafficking activity, and that sex trafficking and prostitution continued to regularly occur on and around their branded hotel premises, including when A.B. was trafficked.[55] Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its branded hotels, Defendant Wyndham failed to take adequate measures to prevent the misconduct.

f.  Defendant Wyndham voluntarily assumed the responsibility to implement sufficient policies to combat sex trafficking at its branded properties through its partnerships with ECPAT and Polaris, its public statements, and its activities with the AHLA and other trade organizations. However, Wyndham failed to

---

[55] *See, e.g., Alexis Stevens,* Atlanta Journal-Constitution, *Four Accused Of Running Prostitution Ring At Clayton County Hotels* (Jan. 12, 2016), https://www.ajc.com/news/crime--law/accused-running-prostitution-ring-claytoncounty-hotels/gPhfieHiNuiov9xM0CmmJO/ (undercover investigation leads to arrests at Atlanta-area Days Inn by Wyndham); *Brian Newlin*, ClickOnDetroit.com, *Man Accused Of Getting Women Hooked On Drugs, Forcing Them Into Prostitution In Southeast Michigan* (Mar. 28, 2018), https://www.clickondetroit.com/news/man-accused-offorcing-women-into-prostitution-in-southeast-michigan (three women held against their will and forced into prostitution at Days Inn); *Matt Johnson*, WSBTV-Atlanta, *Fourteen-Year-Old Among Girls Saved From Motel Prostitution Ring, Police Say* (Mar. 9, 2018), https://www.wsbtv.com/news/local/cobb-county/14-year-old-amonggirls-saved-from-motel-prostitution-sting-police-say/713242739 (police save 14-year-old from pimps at Days Inn); *Andrea Gallo*, The Advocate, *Baton Rouge Passes Ordinance To Curb Sex Trafficking, Drugs, Prostitution At Hotels* (Jan. 24, 2018), https://www.theadvocate.com/baton_rouge/news/article_ac478eb0-0132-11e8-be36-6bb6c3a45ac0.html (frequency of police calls from Days Inn leads to action by Baton Rouge City Council).

FIRST AMENDED COMPLAINT                    31

implement its own policies and those recommended to it by the above mentioned advocacy organizations which led to the inevitable consequence of continued trafficking at its branded properties, including the trafficking of A.B.[56]

g.  Defendant Wyndham owns, supervises, or operates the Days Inn® located at 9107 NE Vancouver Mall Drive Vancouver, WA 98662

h.  Defendant Wyndham owns, supervises, or operates the Ramada® by Wyndham located at 6221 NE 82nd Avenue, Portland, OR 97220.

i.  Wyndham failed to implement and enforce any policy or policies and protect Plaintiff A.B. from being sex trafficked.

j.  Defendant Wyndham knew of sex trafficking occurring on its branded hotel properties.Wyndham, Ramada® and Days Inn® knew that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion.[57] Wyndham, Ramada®, and Days Inn® knew that all of this coercive, violent and/or otherwise criminal activity was occurring at their branded properties and therefore knew that sex trafficking was occurring at their branded properties. Yet Wyndham, Ramada® and Days Inn® allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Days Inn and Ramada hotels. Specifically, Wyndham, Ramada® and

---

[56] *See e.g.,* https://www.bakerdonelson.com/Franchisor-Liability-for-Franchisee-Actions-09-19-2011 (if a franchisor voluntarily assumes responsibility for some aspect of the franchise operations, it may be responsible if it is negligent in doing so).

[57] *See, e.g.*, LVIV International Seminar Focuses on Strategic for Combating Modern Slavery, *available at* http://www.brama.com/issues/pressrel.html.

FIRST AMENDED COMPLAINT            32

Days Inn® facilitated the trafficking through its practices, policies, and procedures. Wyndham, Ramada, and Days Inn failed to take appropriate action to prevent the trafficking of individuals for sex so that Wyndham, Ramada® and Days Inn® could continue to profit from the business that trafficking brings, including business from out-of-state.

k.  Defendant Wyndham should have known of sex trafficking occurring on its branded hotel properties. Wyndham, Ramada® and Days Inn® knew that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. Wyndham, Ramada® and Days Inn® knew that all of this otherwise criminal activity was occurring at their branded properties and therefore knew that sex trafficking was occurring at their branded properties. Yet, Wyndham, Ramada® and Days Inn® allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Ramada® and Days Inn®. Wyndham, Ramada® and Days Inn® facilitated the trafficking through its practices, policies, and procedures. Specifically, Wyndham, Ramada® and Days Inn® failed to take appropriate action to prevent the trafficking of individuals for sex so that Wyndham, Ramada® and Days Inn® could continue to profit from the business that trafficking brings, including business from out-of-state.

l.  Wyndham knew or should have known that the Ramada® and Days Inn® hotels where Plaintiff A.B. was trafficked werein areas known for high incidence of

crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff A.B. was trafficked.

m. Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant Wyndham has repeatedly failed to stop these actions.

n. Wyndham was in an agency relationship with Ramada® and Days Inn® branded hotels offering public lodging services in the hotel. This agency relationship was created through Defendant Wyndham's exercise of an ongoing and systemic right of control over Days Inn® and Ramada® hotels by Defendant Wyndham's operations, including the means and methods of how Days Inn® and Ramada® branded hotels conducted daily business through one or more of the following actions:

   i. providing or requiring the software, hardware, and platforms where suspicious activity or other concerns could be addressed with the Brand;

   ii. providing reservation platforms where payment modes, guest names, or travel habits or history, and suspicious reservations would suggest trafficking;

   iii. providing new hire orientation on human rights and corporate responsibility;

   iv. providing training and education to Days Inn® and Ramada® branded hotels through webinars, seminars, conferences, and online portals;

   v. providing and controlling customer review and response platforms;

vi.    hosting online bookings on Defendant Wyndham's domain;

vii.    requiring Days Inn$_®$ and Ramada® branded hotels to use Defendant Wyndham's customer rewards program;

viii.    requiring Days Inn® and Ramada® branded hotels to use Defendant Wyndham's property management software;

ix.    requiring Days Inn® and Ramada® branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

x.    providing IT support for all property management systems, owned, operated and required by Wyndham;

xi.    setting employee wages;

xii.    making employment decisions;

xiii.    advertising for employment;

xiv.    sharing profits;

xv.    standardized training methods for employees;

xvi.    building and maintaining the facility in a manner specified by the owner;

xvii.    standardized or strict rules of operation;

xviii.    regular inspection of the facility and operation by owner;

xix.    fixing prices; or

xx.    other actions that deprive Ramada® and Days Inn$_®$ branded hotels of independence in business operations.

o.    Upon information and belief, Defendant Wyndham could and in many instances did track and control data regarding guest preferences and other

information, including physical location of guests via their internet enabled devices, guest internet activity via their Wi-Fi services, and inventory information at each branded location. All of this data information was under Defendant Wyndham's management and control and included all of the indicia of A.B.'s trafficking. This data included the details of A.B.'s check-in, the internet activity associated with her reservation, including access to Backpage.com to post advertisements from the hotel, access to other online websites known for secual exploitations, her location at the hotel which included the notable fact that she rarely, if ever, left the hotel despite extended stays, increased use of data due to in-room live video monitoring by her trafficker who frequently sat in the hotel lobby to book additional dates, and the spike in requests for towels and other items from inventory.

p.  An apparent agency also exists between Defendant Wyndham, Ramada® and Days Inn® hotels. Defendant Wyndham held out Ramada® and Days Inn® branded hotels to the public as possessing authority to act on its behalf. Defendant Wyndham clothed the Ramada® and Days Inn® hotels with apparent authority to act for Defendant Wyndham in the following ways: by requiring the use of Wyndham signs, providing Wyndham branded stationery, requiring the use of Wyndham's website and Wyndham's mandated 1-800 toll-free number for guest reservations, and requiring the implementation of Wyndham guest rewards programs. Upon information and belief, Defendant Wyndham's conduct reasonably led A.B.'s perpetrator to believe that Ramada® and Days Inn® had the authority it purported to have, and A.B. was injured as a

result.

q.    Given Defendant Wyndham's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its branded hotels, including Ramada® and Days Inn® branded hotels, Defendant Wyndham breached its duties in the following ways:

i.    did not adequately distribute information to assist employees in identifying human trafficking;

ii.    failed to mandate a process for escalating human trafficking concerns within the organization;

iii.    failed to mandate managers, employees, or owners attend training related to human trafficking;

iv.    failed to provide new hire orientation on human rights and corporate responsibility;

v.    failed to provide any or adequate training and education on human trafficking through webinars, seminars, conferences, and online portals;

vi.    failed to develop and hold or require ongoing training sessions on human trafficking; or

vii.    failed to provide or mandate checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention

viii.    failed to evaluate universal reservation systems for suspicious booking activities;

ix.    failed to evaluate anti-trafficking measures for effectiveness and make

FIRST AMENDED COMPLAINT          37

changes where necessary;

    x.    failed to ban cash or prepaid credit cards as payment; and

    xi.    failed to filter, monitor, and block classified advertising websites known for commercial sex, such as Backpage.com from being accessed via hotel internet service.

r.    Upon information and belief, Defendant Wyndham requires its branded hotel properties to use a property management system, which is linked to Defendant Wyndham's corporate network and data center, for, among other things, receiving reservations, and processing credit card transactions.

s.    Defendant Wyndham uses a centralized reservation system, and states in its privacy policy that it collects information such as contact information, demographics, financial information, government-issued identification numbers, accommodation preferences, location, IP addresses, and social media content from hotel guests.[58]

t.    Since 2012, Wyndham Strategic Sourcing has certified a limited number of wireless internet vendors, to manage Wi-Fi networks for its hotels.[59]

u.    Defendant Wyndham requires its hotels to carry a certain level of Wi-Fi internet access or security for hotel guests, through a limited number of

---

[58] *See* Wyndham Privacy Notice, *available at*
https://www.wyndhamhotels.com/about-us/privacy-notice-more-info?lightbox=/content/whg-ecomm-responsive/en-us/whg/about-us/privacy-notice-more-info.display.html, last accessed August 26, 2020.
[59] *See* Technology Guide: Quick Tips and Best Practices, *available at*
https://www.google.com/url?q=https://ca.developmentsupport.wyndham.com/files/4814/3395/0247/TechCatalog_2015_web.pdf&sa=D&ust=1602215716479000&usg=AFQjCNHz3I200EQFX7n4tqL1GMLmixqSOQ

vendors that Defendant Wyndham specifies and requires.[60]

v.  In 2016, Defendant Wyndham approved two internet vendors.[61] In 2020, Defendant Wyndham approved six: Deep Blue Communications, Safety NetAccess, Air2Data High Speed Wireless, ITG Networks, Allbridge, and Wyndham HCS.[62]

w.  Upon information and belief, Defendant Wyndham requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place, including those that give Defendant Wyndham the ability to access and harvest that internet data.[63]

x.  Upon information and belief, Defendant Wyndham retains and/or can view internet access logs, IP addresses, and other logs reflecting wireless internet access to its hotel properties, including the type of monitoring described above.

y.  Wyndham's centralized property management system also gains Wyndham access to hotel guest information registration, including names, date of booking, and length of stay.

z.  Upon information and belief, Defendant Wyndham can therefore see unusual or suspicious bookings, for instance, when clientele at its branded hotels is

---

[60] *See* 2020 Technology Guide, Q1 2020, published by Wyndham Strategic Sourcing. Brand Standards described in this document and set by Wyndham in 2016 state that "Wi-Fi must be installed and offered complimentary in all guestrooms/suites, lobby, business center, meeting room space and public areas."
[61] *See* Q3 2016 eNews Sourcing News & Best Practices by Wyndham Hotel Group
[62] *See* https://web.archive.org/web/20200427225133/http://transfer.nxtbook.com/nxtbooks/mcneill/vendor_2011winter/offline/mcneill_vendor_2011winter.pdf
[63] *See* Top 10 Hotel Wi-Fi Features, published by Deep Blue Communications in November 2014. One of Wyndham's longest running certified wireless internet vendors, Deep Blue Communications, includes in its marketing materials that (emphasis added) "customized landing pages protect both the guests and hotel from the hassle of disputed charges, and protect the hotel from guests who may use the Internet for illegal purposes."

disproportionately male for same-day bookings for one-night stays, when bookings rotate somewhat uniformly throughout its branded properties, or when reservations for extended stays are requested.

aa.  Upon information and belief, Defendant Wyndham has the capacity to monitor and control brand property hotel guests' access through hotel Wi-Fi to certain websites.[64]

bb.  Upon information and belief, Defendant Wyndham can see when branded property hotel guests are accessing sex buyer advertisements and websites through hotel Wi-Fi, including Plaintiff's advertisements on Backpage.com.

cc.  Upon information and belief, and contrary to ECPAT best practices, Defendant Wyndham failed to block or otherwise limit access to sex buyer advertisements and websites through Wi-Fi.

dd.  Upon information and belief, Defendant Wyndham has the ability to see disproportionately male clientele registering for short hotel stays while accessing backpage.com and other sex buyer advertisements and websites extended to the Days Inn  where Plaintiff was trafficked for sex.

ee.  Despite access to information comprising clear sex trafficking indicators, Defendant Wyndham continued to permit and profit from hotel guests who rented hotel rooms to buy sex, including those who bought Plaintiff.

ff.  Upon information and belief, Defendant Wyndham monitors and reviews reports of criminal activity, including through online reviews, at its branded

---

[64] *See, e.g.*, https://money.cnn.com/2016/07/15/news/companies/starbucks-mcdonalds-wifi-porn/index.html; https://endsexualexploitation.org/articles/filterpublicwifi_starbucks_library_congress/.

FIRST AMENDED COMPLAINT              40

properties.

gg. Upon information and belief, Defendant Wyndham provides a platform for brand property employees to report, at their discretion, to the Brand suspicious activity occurring at their branded hotel. Defendant Wyndham controls and houses this collective data from all branded properties.

hh. Thus, for several years, Defendant Wyndham has demonstrated actual and/or constructive knowledge of the rampant culture of sex trafficking which tragically occurs on its Days Inn® and Ramada® branded properties throughout the country. This same entrenched, pervasive actual and/or constructive knowledge of sex trafficking facilitated the sex trafficking of Plaintiff A.B. at Days Inn® and Ramada® hotels that form the basis of this complaint. For example:

    i. In July 2008, a woman was arrested during a police stakeout at a Days Inn and charged with prostitution for allegedly trading sex for gasoline, while the buyer was charged with promoting prostitution.[65]

    ii. In 2009, police raided several room at a Ramada in Philadelphia and arrested a man in connection with a forced-prostitution ring. Police found nine other women during the raid.[66]

    iii. In February 2010, a prostitution sting that started with a Craigslist ad ended with three metro Atlanta women and a 15-year-old Atlanta girl

---

[65] Sex for Gas, THE SMOKING GUN (Jul. 2, 2008), http://www.thesmokinggun.com/documents/crime/sex-gas.
[66] Dave Davies, *Cops raid Ramada in Northeast, suspect prostitution ring*, THE PHILADELPHIA INQUIRER (Sept. 8, 2009), *available at*
https://www.inquirer.com/philly/hp/news_update/20090908_Cops_raid_Ramada_in_the_Northeast__suspect_prostitution_ring html

FIRST AMENDED COMPLAINT      41

being arrested at a Days Inn hotel.[67]

    iv. In March 2010, a high-profile personal injury lawyer was arrested by Petersburg Police at a Travelodge motel on charges of soliciting a prostitute.[68]

  ii. Additionally, Defendant Wyndham has been aware of sex trafficking on Days Inn and Ramada brand properties through publicly available websites such as www.tripadvisor.com. Online customer reviews demonstrate the pervasiveness of customer reported sex trafficking on Days Inn® and Ramada® brand properties and Defendant Wyndham's inattentiveness, for example:

    i. In September of 2007, a reviewer described a Days Inn in Spartanburg, South Carolina as follows:  "When leaving the room, two prostitutes informed us that, "We've used most of the rooms here and they were fine." We left and stayed at the Choice Inn across the road."[69]

    ii. In September of 2010, a reviewer staying at the Ramada by Wyndham where Plaintiff A.B. was trafficked, was told by a patrolling police officer that the hotel had a local reputation as a craigslist meeting place.[70]

---

[67] Larry Hartstein, *Craigslist prostitution sting nets 4 arrests*, THE ATLANTA JOURNAL-CONSTITUTION (Feb. 9, 2010), https://www.ajc.com/news/local/craigslist-prostitution-sting-nets-arrests/HvY72Eh4nKE1Ej7jo4WIyH/
[68] *Top Lawyer Arrested for Soliciting Prostitute*, STYLE WEEKLY (Apr. 28, 2010), https://www.styleweekly.com/richmond/top-lawyer-arrested-for-soliciting-prostitute/Content?oid=1383889.
[69] Review of Days Inn by Wyndham Spartanburg Waccamaw, Spartanburg, SC (Sept. 29, 2007), *available at* https://www.tripadvisor.com/ShowUserReviews-g54448-d97597-r10019529-Days_Inn_by_Wyndham_Spartanburg _Waccamaw-Spartanburg_South_Carolina.html.
[70] Review of the Ramada by Wyndham, Portland, Oregon (Sept. 16 2010), *available at* https://www.tripadvisor.com/ShowUserReviews-g52024-d96118-r79735448-Ramada_by_Wyndham_Portland_Airp ort-Portland_Oregon.html?m=19905

iii.  In October of 2012, a reviewer described the Days Inn in Fort Myers,
Florida as follows: "thought I was staying in a crackhead/prostitute
hotel. [Y]our corporate office [should] really look at this place. [T]here
were hookers conducting business right outside my front door and [I]
had my children with me!"[71]

iv.  In November of 2012, a reviewer described a stay at the Ramada by
Wyndham, where Plaintiff was trafficked for sex, as follows: "First of
all this place is disgusting. It is full of pimps and hoes and DRUGS…"[72]

v.  In March of 2013, a reviewer described a stay at the Days Inn by
Wyndham Vancouver, where Plaintiff was trafficked for sex, as
follows: "At night their [sic] was possible illegal activity that appeared
to be prostitution going on in the parking lot as well as suspicious drug
deals. How do I know, I am a cop." The General Manager, Emily
Sestoso responded to the review, noting that the "feedback has been not
only helpful but valuable."[73]

vi.  In October of 2013, a reviewer described the Ramada by Wyndham in
Portland, Oregon, where Plaintiff was trafficked for sex, as follows:
"Also noticed what seemed to be PROSTITUTION and DRUG
DEALING on the premises. [Pretty uncomfortable] feeling for my kids.

---

[71]  Review of Days Inn by Wyndham Fort Myers, Fort Myers, FL (Oct. 10, 2012), *available at*
https://www.tripadvisor.com/ShowUserReviews-g34230-d84524-r142467996-Days_Inn_by_Wyndham_Fort_Myer
s-Fort_Myers_Florida.html.
[72]  Review of Ramada by Wyndham Portland Airport (Nov. 2012), *available at*
https://www.tripadvisor.com/ShowUserReviews-g52024-d96118-r146521788-Ramada_by_Wyndham_Portland_Air
port-Portland_Oregon.html.
[73]  Review of Days Inn & Suites by Wyndham Vancouver (Mar. 2013), *available at*
https://www.tripadvisor.com/Hotel_Review-g60820-d1200410-Reviews-or460-Days_Inn_Suites_by_Wyndham_Va
ncouver-Vancouver_Washington.html.

FIRST AMENDED COMPLAINT                43

[All in all,] do everyone a favor and BURN THIS PLACE DOWN…"[74]

vii.   In August of 2015, a reviewer described the Days Inn in Fort Myers, Florida as follows: "This motel is filled with drug dealers and prostitutes. The owner/[management] is well aware of this and does nothing about it. While there a woman overdosed and the police were there four times in other drug related issues... "[75]

viii.  In September of 2015, a reviewer described a Ramada by Wyndham Portland as follows: "Not a safe neighborhood… Lots of drug & prostitution activity. Every night there were police cars in the motel next door. There's 2-3 dingy stripclubs in the neighborhood. Staff is very out of touch with customers…"[76]

ix.    In May of 2016, a reviewer described the Ramada by Wyndham Portland Airport where the Plaintiff was trafficked for sex, as follows: "Grossest motel ever… I turned into the police because I believe drug and prostitution was going on and turned into the health department. Place should be condemned."[77]

x.     In July of 2017, a reviewer described the Ramada by Wyndham Portland Airport where the Plaintiff was trafficked for sex as follows: "Hotel is

---

[74] Review of Ramada by Wyndham Portland Airport (Oct. 2013), *available at* https://www.tripadvisor.com/ShowUserReviews-g52024-d96118-r180274743-Ramada_by_Wyndham_Portland_Airport-Portland_Oregon.html.
[75] Review of Days Inn by Wyndham Fort Myers, Fort Myers, FL (Aug. 1, 2015), *available at* https://www.tripadvisor.com/ShowUserReviews-g34230-d84524-r294688173-Days_Inn_by_Wyndham_Fort_Myers-Fort_Myers_Florida.html.
[76] Review of Ramada by Wyndham Portland (Sept. 10, 2015), *available at* https://www.tripadvisor.com/ShowUserReviews-g52024-d102048-r309057362-Ramada_by_Wyndham_Portland-Portland_Oregon.html.
[77] Review of Ramada by Wyndham Portland Airport (May 2016), *available at* https://www.tripadvisor.com/ShowUserReviews-g52024-d96118-r376230952-Ramada_by_Wyndham_Portland_Airport-Portland_Oregon.html.

FIRST AMENDED COMPLAINT                    44

run down… When we returned to park and fly police were there and prostitution situation was occurring. We felt uncomfortable."[78]

jj.  Despite evidence of prostitution and sex trafficking occurring for years at the Days Inn® by Wyndham and Ramada® by Wyndham where Plaintiff A.B. was trafficked, Wyndham has failed to meaningfully address the issue and escort ads continue to advertise this location for commercial sex.

kk.  Upon information and belief, Defendant Wyndham monitors customer reviews and complaints for all brand properties, including the Ramada and Days Inn where Plaintiff A.B. was trafficked for sex.

ll.  Upon information and belief, the branded properties depend on Defendant Wyndham for notification of negative customer reviews.

mm.  Upon information and belief, Defendant Wyndham, not the branded properties, house and control the data regarding customer reviews.

92.  MARRIOTT INTERNATIONAL, INC. ("MARRIOTT"):

a.  Defendant Marriott owns, supervises, or operates the Residence Inn® located at 9301 NE Cascades Parkway, Portland, Oregon 97220. Marriott failed to implement and enforce any of its own policy or policies and protect Plaintiff A.B. from being sex trafficked.

b.  Defendant Marriott voluntarily assumed the responsibility to implement sufficient policies to combat sex trafficking at its branded properties through its partnership with ECPAT, and its activities with the AHLA and other trade organizations. However, Marriott failed to implement its own policies and

---

[78] Review of Ramada by Wyndham Portland Airport (Jul. 10, 2017), *available at* https://www.tripadvisor.com/ShowUserReviews-g52024-d96118-r500462409-Ramada_by_Wyndham_Portland_Airport-Portland_Oregon.html.

those recommended to it by the above mentioned advocacy organization which led to the inevitable consequence of continued trafficking at its branded properties, including the trafficking of A.B.[79]

c.  Upon information and belief, Plaintiff alleges that Marriott implemented means in which it could monitor various reviews of prostitution, trafficking, and guest safety issues.

d.  Defendant Marriott knew of sex trafficking occurring on its branded hotel properties. Marriott and Residence Inn[®] knew that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. Marriott and Residence Inn[®] knew that all of this violent and criminal activity was occurring at their branded properties therefore they knew that sex trafficking was occurring at their branded properties. Yet, Marriott and Residence Inn[®] allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Residence Inn[®]. Specifically, Marriott and Residence Inn[®] facilitated the trafficking through its practices, policies, and procedures. Marriott and Residence Inn[®] failed to take appropriate action to prevent the trafficking of individuals for sex so that Marriott and Residence Inn[®] could continue to profit from the business that trafficking brings, including business from out-of-state.

e.  Defendant Marriott should have known of sex trafficking occurring on its

---

[79] *See e.g.*, https://www.bakerdonelson.com/Franchisor-Liability-for-Franchisee-Actions-09-19-2011 (if a franchisor voluntarily assumes responsibility for some aspect of the franchise operations, it may be responsible if it is negligent in doing so).

FIRST AMENDED COMPLAINT                    46

branded hotel properties. Marriott and Residence Inn$_®$ knewthat sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. Marriott and Residence Inn$_®$ knew that all of this violent and criminal activity was occurring at their branded properties therefore they knew that sex trafficking was occurring at their branded properties. Yet Marriott and Residence Inn$_®$ allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Residence Inn$_®$. Marriott and Residence Inn$_®$ facilitated the trafficking through its practices, policies, and procedures. Marriott and Residence Inn$_®$ failed to take appropriate action to prevent the trafficking of individuals for sex so that Marriott and Residence Inn$_®$ could continue to profit from the business that trafficking brings, including business from out-of-state.

f.   Marriott knew or should have known that the Residence Inn$_®$ hotel where Plaintiff A.B. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff A.B. was trafficked.

g.   Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendant Marriott has repeatedly failed to stop these actions.

h.   Marriott was in an agency relationship with Residence Inn$_®$ branded hotels offering public lodging services in the hotel. This agency relationship was

created through Defendant Marriott's exercise of an ongoing and systemic right of control over Residence Inn® hotels by Defendant Marriott's operations, including the means and methods of how Residence Inn® branded hotels conducted daily business through one or more of the following actions:

i. providing or requiring the software, hardware, and platforms where suspicious activity or other concerns could be addressed with the Brand;

ii. providing reservation platforms where payment modes, guest names, or travel habits or history, and suspicious reservations would suggest trafficking;

iii. providing new hire orientation on human rights and corporate responsibility;

iv. providing training and education to Residence Inn® branded hotels through webinars, seminars, conferences, and online portals;

v. providing and controlling customer review and response platforms;

vi. hosting online bookings on Defendant Marriott's domain;

vii. requiring Residence Inn® branded hotels to use Defendant Marriott's customer rewards program;

viii. requiring Residence Inn® branded hotels to use Defendant Marriott's property management software;

ix. requiring Residence Inn® branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

x. providing IT support for all property management systems, owned, operated and required by Marriott;

FIRST AMENDED COMPLAINT           48

xi.    setting employee wages;

xii.   making employment decisions;

xiii.  advertising for employment;

xiv.   sharing profits;

xv.    standardized training methods for employees;

xvi.   building and maintaining the facility in a manner specified by the owner;

xvii.  standardized or strict rules of operation;

xviii. regular inspection of the facility and operation by owner;

xix.   fixing prices; or

xx.    other actions that deprive Residence Inn$_®$ branded hotels of independence in business operations.

i.  Upon information and belief, Defendant Marriott could, and in many instances did, track and control data regarding guest preferences and other information, including physical location of guests via their internet enabled devices, guest internet activity via their Wi-Fi services, and inventory information at each branded location. All of this data information was under Defendant Marriott's management and control and included all of the indicia of A.B.'s trafficking. This data included the details of A.B.'s check-in, the internet activity associated with her reservation, including access to Backpage.com to post advertisements from the hotel, access to other online websites known for secual exploitations, her location at the hotel which included the notable fact that she rarely, if ever, left the hotel despite extended stays, increased use of data due to in-room live video monitoring by her trafficker who frequently sat in the hotel lobby to book

additional dates, and the spike in requests for towels and other items from inventory.

j.  An apparent agency also exists between Defendant Marriott and Residence Inn®️ hotels. Defendant Marriott held out Residence Inn®️ branded hotels to the public as possessing authority to act on its behalf. Defendant Marriott clothed the Residence Inn®️ with apparent authority to act for Defendant Marriott in the following ways: by requiring the use of Marriott signs, providing Marriott branded stationery, requiring the use of Marriott's website and Marriott's mandated 1-800 toll-free number for guest reservations, and requiring the implementation of Marriott guest rewards programs. On information and belief, Defendant Marriott's conduct reasonably led A.B.'s perpetrator to believe that the Residence Inn®️ had the authority it purported to have, and A.B. was injured as a result.

k.  Given Defendant Marriott's public statements on behalf of its hotel brands and the control it assumed in educating, implementing, and directing its branded hotels, including Residence Inn®️ branded hotels, Defendant Marriott breached its duties in the following ways:

   i.    did not adequately distribute information to assist employees in identifying human trafficking;

   ii.   failed to mandate a process for escalating human trafficking concerns within the organization;

   iii.  failed to mandate managers, employees, or owners attend training related to human trafficking;

iv.    failed to provide new hire orientation on human rights and corporate responsibility;

v.     failed to provide any or adequate training and education on human trafficking through webinars, seminars, conferences, and online portals;

vi.    failed to develop and hold or require ongoing training sessions on human trafficking; or

vii.   failed to provide or mandate checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention

viii.  failed to evaluate universal reservation systems for suspicious booking activities;

ix.    failed to evaluate anti-trafficking measures for effectiveness and make changes where necessary;

x.     failed to ban cash or prepaid credit cards as payment; and

xi.    failed to filter, monitor, and block classified advertising websites known for commercial sex, such as Backpage.com and Craigslist.com, from being accessed via hotel internet service.

l.   Upon information and belief, Defendant Marriott requires its hotels to carry a certain level of Wi-Fi internet access for hotel guests, through vendors that Defendant Marriott specifies and requires.[80]

m.  Upon information and belief, Defendant Marriott requires its hotels to carry

---

[80] See https://blueportwireless.com/gpns-certified/ ("On May 22, 2013, Blueport Wireless becomes the first vendor to be certified in the 2013 Marriott Global Property Network Standard."); see also https://www.deepbluecommunications.com/industries/hotel-wifi/marriott/ ("Deep Blue has been a Marriott GPNS Certified Hotel WiFi Vendor since 2011.")..

FIRST AMENDED COMPLAINT          51

Wi-Fi internet access with certain cybersecurity measures in place, including those that give Defendant Marriott access to the internet data.

n.  Defendant Marriott states in its privacy policy that it collects the following categories of information from hotel guests: contact information such as name, gender, postal address, telephone number, email address; financial information such as credit and debit card number or other payment data; date and place of birth; membership or loyalty program data; social media account IDs, profile photos or data made available by linking social media and loyalty accounts; biometric data; images and video and audio data via security cameras in public areas and body-worn cameras carried by loss prevention officers and other security personnel; and other technological data including a customer's browser or device, data collected when downloading or using an app; cookies that collect data such as time spent on online services, pages visited, and IP addresses.[81]

o.  Defendant Marriott retains and can view internet access which may include DNS logs, IP addresses, temporary internet files or other logs reflecting wireless internet access to its hotel properties, including the type of monitoring described above.

p.  Marriott's centralized property management system[82] also gains Marriott access to hotels guest information registration, including names, date of

---

[81] *See* Marriott International, Inc.'s Privacy Policy, *available at*
https://www.marriott.com/about/privacy.mi#data-covered
[82] *See, e.g.,* Marriott International Selects Cloud-based MICROS OPERA as Its Next-Generation Property Management System for all North America Properties, *available at*
https://www.prnewswire.com/news-releases/marriott-international-selects-cloud-based-micros-opera-as-its-next-generation-property-management-system-for-all-north-america-properties-204731811 html

FIRST AMENDED COMPLAINT               52

booking, and length of stay.

q.   Upon information and belief, Defendant Marriott can therefore see unusual or suspicious bookings, for instance, when clientele at its branded hotels is disproportionately male for same-day bookings for one-night stays, when bookings rotate somewhat uniformly throughout its branded properties, or when reservations for extended stays are requested.

r.   Upon information and belief, Defendant Marriott has the capacity to monitor and control branded property hotel guests' access through hotel Wi-Fi to certain websites.[83]

s.   Upon information and belief, Defendant Marriott can see when branded property hotel guests are accessing sex buyer advertisements and websites through hotel Wi-Fi, including Plaintiff's advertisements on Backpage.com.

t.   Upon information and belief, and contrary to ECPAT best practices, Defendant Marriott failed to block or otherwise limit access to sex buyer advertisements and websites through Wi-Fi.

u.   Upon information and belief, Defendant Marriott's ability to see disproportionately male clientele registering for short hotel stays while accessing backpage.com and other sex buyer advertisements and websites extended to the Residence Inn where Plaintiff was trafficked for sex.

v.   Despite access to information comprising clear sex trafficking indicators, Defendant Marriott continued to permit and profit from male clientele who

---

[83] *See* Marriott to Pay $600,000 to Resolve Wi-Fi Blocking Investigation, *available at* https://assets.documentcloud.org/documents/1308852/doc-329743a1.pdf*; see also, e.g.*, https://traveltips.usatoday.com/hotels-track-internet-usage-111659.html ("the hotel's server usually has a log file that lists every connection the server makes for its users while they browse using its network.").

FIRST AMENDED COMPLAINT                 53

rented hotel rooms to buy sex, including those who bought Plaintiff.

w. Upon information and belief, Defendant Marriott monitors and reviews reports of criminal activity, including through online reviews, at its branded properties.

x. Upon information and belief, Defendant Marriott provides a platform for brand employees to report, at their discretion, to the Brand suspicious activity occurring at their branded hotel. Defendant Marriott controls and houses this collective data from all branded properties.

y. Thus, for several years, Defendant Marriott has demonstrated actual and/or constructive knowledge of the rampant culture of sex trafficking which tragically occurs on its Residence Inn® branded properties throughout the country. This same entrenched, pervasive actual and/or constructive knowledge of sex trafficking facilitated the sex trafficking of Plaintiff A.B. at Residence Inn® hotels that forms the basis of this complaint. For example:

   i. In January 2009, the first "john" was prosecuted in connection with Charlotte's high-priced prostitution ring after being seen leaving Room 106 of the Residence Inn.[84]

   ii. In October 2009, the Westchester County District Attorney arrested three women on charges for promoting prostitution. The three women recruited, managed, and scheduled nearly a dozen women, sending them on calls to hotels all over the city, including the Residence Inn.[85]

---

[84] Gary L. Wright, *Charlotte businessman faces prostitution charge*, THE HERALD (Jan. 7, 2009), https://www.heraldonline.com/news/local/article12247145 html.
[85] *Prostitution bust in Westchester Co.*, ABC 7 NY (Oct. , 2009), https://abc7ny.com/archive/7055026/.

iii. In August 2010, a prostitute's boyfriend ended up dead at the Residence Inn when a john thought he had been robbed and came back with a gun.[86] As a result, the hotels worked with police to prevent prostitution rings from operating out of the hotel rooms and the police educated them on how to spot suspicious activity.[87]

iv. In February 2015, seven men were arrested at the Residence Inn in Wilmette for engaging in prostitution during an undercover prostitution sting.[88]

v. In February 2018, a former Utah lawmaker was accused of purchasing two hotel rooms at the Residence Inn using taxpayer money to meet with a prostitute.[89] His 2017 campaign finance report showed an expense for $1,510 for "extra hotel expense session lodging" at the "Marriott Residence."[90]

z. Additionally, Defendant Marriott has been aware of sex trafficking on Residence Inn brand properties through publicly available websites such as www.tripadvisor.com. Online reviews show the pervasiveness of customer reported sex trafficking on Residence Inn brand properties and Defendant Marriott's inattentiveness, for example:

---

[86] Police target prostitution at airport hotels, THE PHILADELPHIA INQUIRER (Aug. 19, 2010), https://www.inquirer.com/philly/news/breaking/20100819_Police__Airport_hotels_becoming_hubs_for_prostitution.html.
[87] Id.
[88] Prostitution Sting Arrests Five in Wilmette, DAILY NORTH SHORE (Feb. 13, 2015), https://jwcdaily.com/2015/02/13/prostitution-sting-arrests-five-in-wilmette/.
[89] Utah taxpayers paid for hotel linked to prostitute report, APNEWS (Feb. 9, 2018), https://www.apnews.com/9692f9fa6a82467093dc0d250a2dd44e.
[90] Id.

FIRST AMENDED COMPLAINT                    55

      i.  A reviewer describing a stay at the Residence Inn Portland Airport at Cascade Station, where the Plaintiff was trafficked for sex, as follows: "Safety and security issues at night… Had an issue with guests across our room having with noise and non-registered guests going in and out of the room from late at night to the early morning. Called the front desk, they sent a staff member, who told the guests that we complained about the noise and foot traffic. Noise became louder…"[91]

  aa.  Upon information and belief, Defendant Marriott monitors customer reviews and complaints for all brand properties.

  bb.  Upon information and belief, the branded properties depend on Defendant Marriott for notification of negative customer reviews.

  cc.  Upon information and belief, Defendant Marriott, not the branded properties, house and control the data regarding customer reviews.

93.   RED LION HOTELS CORPORATION ("RLHC"):

  a.  Defendant RLHC owns, supervises, or operates the Red Lion® hotel located at 3301 Market Street NE Salem, Oregon 97301. RLHC failed to implement and enforce any of its own policy or policies and protect Plaintiff A.B. from being sex trafficked.

  b.  Defendant RLHC voluntarily assumed the responsibility to implement sufficient policies to combat the known problem of sex trafficking at its branded properties through its activities with the AHLA and other trade

---

[91] Review of Residence Inn Portland Airport at Cascade Station, Portland, Oregon (Sept. 23, 2010), *available at* https://www.tripadvisor.com/ShowUserReviews-g52024-d1484591-r80766839-Residence_Inn_Portland_Airport_at_Cascade_Station-Portland_Oregon.html.

organizations. However, RLHC failed to implement its own policies and those recommended to it by the above mentioned trade organization which led to the inevitable consequence of continued trafficking at its branded properties, including the trafficking of A.B.[92]

c. Upon information and belief, Plaintiff alleges that RLHC implemented means in which it could monitor various reviews of prostitution, trafficking, and guest safety issues.

d. Defendant RLHC knew of sex trafficking occurring on its branded hotel properties.[93] RLHC and the Red Lion hotel knew that sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. RLHC and Red Lion® knew that all of this violent and criminal activity was occurring at their branded properties therefore they knew that sex trafficking was occurring at their branded properties. Yet RLHC and the Red Lion hotelallowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Red Lion hotel. Specifically, RLHC and the Red Lion hotel facilitated the trafficking through its practices, policies, and procedures. RLHC and the Red Lion hotelfailed to take appropriate action to prevent the trafficking of individuals for sex so that RLHC and the Red Lion

---

[92] *See e.g.,* https://www.bakerdonelson.com/Franchisor-Liability-for-Franchisee-Actions-09-19-2011 (if a franchisor voluntarily assumes responsibility for some aspect of the franchise operations, it may be responsible if it is negligent in doing so).
[93] *See e.g.,* Sarah Mirk, Sen. Wyden Pitches Bill to "Beat the Pimps", PORTLAND MERCURY (Jan. 11, 2010), *available at*
https://www.portlandmercury.com/BlogtownPDX/archives/2010/01/11/sen-wyden-pitches-bill-to-beat-the-pimpshtt
ps://www.portlandmercury.com/BlogtownPDX/archives/2010/01/11/sen-wyden-pitches-bill-to-beat-the-pimps

hotelcould continue to profit from the business that trafficking brings, including business from out-of-state.

e. Defendant RLHC should have known of sex trafficking occurring on its branded hotel properties. RLHC and the Red Lion hotelknewthat sex trafficking and prostitution are associated, that both carry a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. RLHC and the Red Lion hotel knew that all of this violent and criminal activity was occurring at their branded properties therefore they knew that sex trafficking was occurring at their branded properties. Yet RLHC and the Red Lion hotel allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the Red Lion hotel. Specifically, RLHC and the Red Lion hotel facilitated the trafficking through its practices, policies, and procedures. RLHC and the Red Lion hotelfailed to take appropriate action to prevent the trafficking of individuals for sex so that RLHC and the Red Lion hotel could continue to profit from the business that trafficking brings, including business from out-of-state.

f. RLHC knew or should have known that the Red Lion hotel where Plaintiff A.B. was trafficked was an area known for high incidence of crime and prone to sex trafficking activity on and around the hotel premises, including when Plaintiff A.B. was trafficked.

g. Despite having knowledge of the extensive prostitution and sex trafficking that

occurs at its hotels, Defendant RLHC has repeatedly failed to stop these actions.

h. RLHC was in an agency relationship with Red Lion® branded hotels offering public lodging services in the hotel. This agency relationship was created through Defendant RLHC's exercise of an ongoing and systemic right of control over Red Lion® hotels by Defendant RLHC's operations, including the means and methods of how Red Lion® branded hotels conducted daily business through one or more of the following actions:

    i. providing or requiring the software, hardware, and platforms where suspicious activity or other concerns could be addressed with the Brand;

    ii. providing reservation platforms where payment modes, guest names, or travel habits or history, and suspicious reservations would suggest trafficking;

    iii. providing new hire orientation on human rights and corporate responsibility;

    iv. providing training and education to Red Lion® branded hotels through webinars, seminars, conferences, and online portals;

    v. providing and controlling customer review and response platforms;

    vi. hosting online bookings on Defendant RLHC's domain;

    vii. requiring Red Lion® branded hotels to use Defendant RLHC's customer rewards program;

    viii. requiring Red Lion® branded hotels to use Defendant RLHC's property management software;

ix.   requiring Red Lion® branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

x.   providing IT support for all property management systems, owned, operated and required by RLHC;

xi.   setting employee wages;

xii.   making employment decisions;

xiii.   advertising for employment;

xiv.   sharing profits;

xv.   standardized training methods for employees;

xvi.   building and maintaining the facility in a manner specified by the owner;

xvii.   standardized or strict rules of operation;

xviii.   regular inspection of the facility and operation by owner;

xix.   fixing prices; or

xx.   other actions that deprive Red Lion® branded hotels of independence in business operations.

i.   Upon information and belief, Defendant RLHC could, and in many instances did, track and control data regarding guest preferences and other information, including physical location of guests via their internet enabled devices, guest internet activity via their Wi-Fi services, and inventory information at each branded location. All of this data and information was under Defendant RLHC's management and control and included all of the indicia of A.B.'s trafficking. This data included the details of A.B.'s check-in, the internet activity associated with her reservation, including access to Backpage.com to

post advertisements from the hotel, access to other online websites known for secual exploitations, her location at the hotel which included the notable fact that she rarely, if ever, left the hotel despite extended stays, increased use of internet data due to in-room live video monitoring by her trafficker who frequently sat in the hotel lobby to book additional dates, and the spike in requests for towels and other items from inventory.

j. An apparent agency also exists between Defendant RLHC and Red Lion® hotels. Defendant RLHC held out Red Lion® branded hotels to the public as possessing authority to act on its behalf. Defendant RLHC clothed the Red Lion® hotels with apparent authority to act for Defendant RLHC in the following ways: by requiring the use of Red Lion signs, providing Red Lion branded stationery, requiring the use of Red Lion's website and Red Lion's mandated 1-800 toll-free number for guest reservations, and requiring the implementation of Red Lion guest rewards programs. Upon information and belief, Defendant RLHC's conduct reasonably led A.B.'s perpetrator to believe that the Red Lion® hotels had the authority it purported to have, and A.B. was injured as a result

k. Given Defendant RLHC's position and authority to control the education, implementation, and direction of its branded hotels, including Red Lion® branded hotels, Defendant RLHC breached its duties in the following ways:

  i.  did not adequately distribute information to assist employees in identifying human trafficking;

  ii.  failed to mandate a process for escalating human trafficking concerns

within the organization;

iii.   failed to mandate managers, employees, or owners attend training related to human trafficking;

iv.   failed to provide new hire orientation on human rights and corporate responsibility;

v.   failed to provide any or adequate training and education on human trafficking through webinars, seminars, conferences, and online portals;

vi.   failed to develop and hold or require ongoing training sessions on human trafficking;

vii.   failed to provide or mandate checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention;

viii.   failed to evaluate universal reservation systems for suspicious booking activities;

ix.   failed to evaluate anti-trafficking measures for effectiveness and make changes where necessary;

x.   failed to ban cash or prepaid credit cards as payment; and

xi.   failed to filter, monitor, and block classified advertising websites known for commercial sex, such as Backpage.com and Craigslist.com, from being accessed via hotel internet service.

l.   Upon information and belief, Defendant RLHC requires its hotels to carry a certain level of Wi-Fi internet access for hotel guests through vendors that

Defendant RLHC specifies and requires.[94]

m.  Upon information and belief, Defendant RLHC requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place, including those that give Defendant RLHC access to the internet data.

n.  Defendant RLHC states in its privacy policy that it collects the following categories of information from hotel guests:  name and contact information, customer information including addresses and government identification documents, social media handles, financial information, purchase history and tendencies, geolocation data, audio and video data, and internet usage data, such as cookies, IP address, the type of device used, login data, browser type and version, geolocation, and other technology.[95]

o.  Defendant RLHC retains and can view internet access which may include DNS logs, IP addresses, temporary internet files or other logs reflecting wireless internet access to its hotel properties, including the type of monitoring described above.

p.  RLHC's centralized property management system also gains RLHC access to hotels guest information registration, including names, date of booking, and length of stay.

q.  Upon information and belief, Defendant RLHC can therefore see unusual or suspicious bookings, for instance, when clientele at its branded hotels is disproportionately male for same-day bookings for one-night stays, when bookings rotate somewhat uniformly throughout its branded properties, or

---

[94] *See* Red Lion Preferred Vantage Vendor, *available at* https://www hotelwifi.com/red-lion-preferred-vendor/.
[95] *See* https://www.redlion.com/privacy.

when reservations for extended stays are requested.

r.  Upon information and belief, Defendant RLHC has the capacity to monitor and control branded property hotel guests' access through hotel Wi-Fi to certain websites.

s.  Upon information and belief, Defendant RLHC can see when branded property hotel guests are accessing sex buyer advertisements and websites through hotel Wi-Fi, including Plaintiff's advertisements on Backpage.com.

t.  Upon information and belief, and contrary to ECPAT best practices, Defendant RLHC failed to block or otherwise limit access to sex buyer advertisements and websites through Wi-Fi.

u.  Upon information and belief, Defendant RLHC'S ability to see disproportionately male clientele registering for short hotel stays while accessing backpage.com and other sex buyer advertisements and websites extended to the Red Lion hotel where Plaintiff was trafficked for sex.

v.  Despite access to information comprising clear sex trafficking indicators, Defendant RLHC continued to permit and profit from male clientele who rented hotel rooms to buy sex, including those who bought Plaintiff.

w.  Defendant RLHC reviews and monitors complaints at its branded hotel properties and charges properties a Guest Intervention Fee if the 12-month complaint rate is above a certain number.

x.  Upon information and belief, Defendant RLHC monitors and reviews reports of criminal activity, including through online reviews, at its branded properties.

FIRST AMENDED COMPLAINT                64

y.  Upon information and belief, Defendant RLHC provides a platform for brand employees to report, at their discretion, to the Brand suspicious activity occurring at their branded hotel. Defendant RLHC controls and houses this collective data from all branded properties

z.  Thus, for years, Defendant RLHC has demonstrated actual and/or constructive knowledge of the rampant culture of sex trafficking which tragically occurs on its Red Lion® branded properties throughout the country. This same entrenched, pervasive actual and/or constructive knowledge of sex trafficking facilitated the sex trafficking of Plaintiff A.B. at Red Lion® hotels that forms the basis of this complaint.

  i.  In August 2008, a woman was arrested for operating a prostitution ring within several hotels, including the Red Lion, and employing a 16-year old.[96]

  ii.  In April 2010, a 20-year-old man and two teens were charged with forcing an 18-year old girl to sell sex out of the Red Lion Inn.[97]

  iii. In September 2011, a 31-year-old man was arrested for compelling prostitution after setting up a prostitution date for a juvenile girl at the Red Lion Hotel near the airport.[98]

  iv.  In November 2013, a woman was arrested and charged with prostitution for soliciting sex at a Red Lion Hotel in Elko. Hotel staff told police they observed the woman "making her way throughout the

---

[96] Tom McGhee, *Madam employed 16-year-old, used hotels, court papers say*, DENVER POST (Aug. 11, 2008), https://www.denverpost.com/2008/08/11/madam-employed-16-year-old-used-hotels-court-papers-say/.
[97] *Three charged with forcing teen to prostitute at Bellevue hotels*, SEATTLE PI (April 26, 2010), https://www.seattlepi.com/local/article/Three-charged-with-forcing-teen-to-prostitute-at-882161.php.
[98] *Undercover police sting nabs a pimp prostituting a juvenile girl at Red Lion Hotel, police say*, OREGONLIVE (Sept. 15, 2011), https://www.oregonlive.com/portland/2011/09/undercover_police_sting_nabs_a.html.

casino speaking with several patrons within the casino as if she was propositioning people."[99]

v. In April 2018, a man was arrested at the Red Lion Hotel for assaulting, robbing, and holding prostitutes against their will in a hotel room.[100]

vi. In August 2019, a man was arrested on federal sex trafficking charges at the Red Lion Hotel after officers monitoring online prostitution responded to a prostitution ad online.[101]

aa. Additionally, Defendant RLHC has been aware of sex trafficking on Red Lion brand properties through publicly available websites such as www.tripadvisor.com. Online customer reviews demonstrate the pervasiveness of customer reported sex trafficking on Red Lion brand properties and Defendant RLHC's inattentiveness, for example:

i. In March of 2013, a reviewer titled a review of a Red Lion Inn in Victoria, British Columbia, as "Should be called the Hooker Hotel," and further explained: "If you like stained furniture in your room, hookers standing out front, a liquor store onsite and the sounds of loud parties with hookers all night then this is the place for you."[102]

---

[99] Caley Cook, *Sex Solicitor sentenced to community service*, ELKO DAILY (Nov. 13, 2013), https://elkodaily.com/news/sex-solicitor-sentenced-to-community-service/article_4ffd640c-4cd4-11e3-851c-001a4b cf887a.html.
[100] *Frantic prostitute alerts Wenatchee police about her attacker; two arrested*, iFIBERONE (Apr. 6, 2018), http://www.ifiberone.com/columbia_basin/frantic-prostitute-alerts-wenatchee-police-about-her-attacker-two-arreste d/article_da4591ac-39f6-11e8-9300-e7734bfabe6c.html.
[101] *Man arrested on federal sex trafficking charges*, WYOMING TRIBUNE EAGLE (Aug. 8, 2019), https://www.wyomingnews.com/news/local_news/man-arrested-on-federal-sex-trafficking-charges/article_310a0fce -3cc3-59d7-899f-923558845803.html.
[102] Review of Red Lion Inn & Suites Victoria, Victoria, British Columbia (Apr. 28, 2013), available at https://www.tripadvisor.com/ShowUserReviews-g154945-d182597-r159076862-Red_Lion_Inn_Suites_Victoria-Vi ctoria_Victoria_Capital_Regional_District_Vancouve html.

FIRST AMENDED COMPLAINT          66

bb. Upon information and belief, Defendant RLHC monitors customer reviews and complaints for all brand properties.

cc. Upon information and belief, the branded properties depend on Defendant RLHC for notification of negative customer reviews.

dd. Upon information and belief, Defendant RLHC, not the branded properties, house and control the data regarding customer reviews.

**C.    THE SEX TRAFFICKING OF A.B. AT THE DAYS INN BY WYNDHAM**

94.    From approximately November 2012 through March 2013, the Plaintiff was sex trafficked at the Days Inn by Wyndham located at 9107 NE Vancouver Mall Drive Vancouver, WA 98662.

95.    During the time she was sex trafficked, Plaintiff A.B. was coerced or forced into having sex with various buyers at Wyndham's hotels in response to advertisements for commercial sex that her trafficker posted on websites such as backpage.com, which may have included, but is not limited to, the following specific dates: December 16, 2012; December 19, 2012; December 26, 2012; February 5, 2013; February 7, 2013; February 19, 2013; and February 25, 2013 through February 27, 2013.

96.    When at the Days Inn, Plaintiff A.B. was sold by her trafficker to  least 7 "clients" per night or until the night slowed down.

97.    Plaintiff's trafficker would book her at the Days Inn by Wyndham anywhere from one (1) to four (4) nights at a time before rotating her to other hotels, and she would generally be placed at the Days Inn up to two times in the same month, or 6 to 12 stays over 4 to 5 months.

98.    Wyndham's central reservation system would have shown the room reservations

FIRST AMENDED COMPLAINT                67

made by her trafficker, a local resident, at both the Ramada and Days Inn hotels.

99.    Plaintiff recalls her trafficker being kicked out of the Days Inn due to screams from another woman he was trafficking during the time when Plaintiff was being trafficked.  Had there been any concern, hotel employees or Wyndham would have reviewed the trafficker's booking history at its properties, including the Days Inn and Ramada, and monitored future bookings or notified the police of the suspicious activities.

100.    A.B.'s trafficker, a local to the area, always booked and paid for the rooms directly from the front desk or online. He paid for the room using his debit card or cash.  After booking the room, her trafficker would get two keys and take one key to A.B., who would have to wait for him in the car. Each time, A.B. would walk to the room by herself, often through the front door and past the lobby, not having registered as a guest.

101.    Her trafficker would then re-enter the hotel and continue to book dates from the hotel area, including from his car where he would have sat for long periods of time or from the hot tub area at the hotel.

102.    During times she was with a "john," her trafficker would use the hotel's Wi-Fi to post advertisements on backpage and set up "dates" with "johns." Her trafficker would often also use the hotel's Wi-Fi to record the sex acts taking place with A.B. from inside the room. Upon information and belief, her trafficker used the hotel's Wi-Fi to connect his laptop to the laptop used to watch and record the sex trafficking of A.B. in her room.

103.    Upon information and belief, recordings of this nature would have signaled large amounts of data usage identifiable by the hotels directly by slowing and delays caused by the drag on connectivity throughout the hotel.

104.    Upon information and belief, the location of the computers involved in these

recordings could be identified given the modems and access locations, which would be available and identifiable to the hotels and any third-party established to maintain and monitor Wi-Fi access.

105.    Each buyer entering the Days Inn by Wyndham was a non-paying guest and left shortly after he arrived. Her trafficker would wait in the lobby or in the car while A.B. was sex trafficked at Defendant Wyndham's hotel.  The foot traffic to the rooms was constant and voluminous.  When the hotel doors were locked at night, Plaintiff A.B. would walk out to open the front lobby doors for unregistered men late at night without being questioned by any employee.

106.    Abundant condoms were scattered across various surfaces and visible to any hotel employee who entered the room.

107.    A.B. was told to avoid eye contact with hotel staff and to not to engage in conversation with anyone. Despite numerous surveillance cameras throughout the hotel, no help or attention was given to A.B. by any hotel staff.

108.    The Plaintiff repeatedly encountered the same hotel staff over the course of time she was trafficked for sex at the Days Inn by Wyndham.  Hotel staff were inadequately trained and unprepared to address the ongoing torture the Plaintiff endured while she was regularly trafficked for sex at Wyndham's hotel.

109.    Despite signs of human trafficking on repeated occasions over five months (including, but not limited to, no eye contact and duration of stay) and indicators of commercial sex activity (bottles of lubricants, boxes of condoms, used condoms in the trash, excessive requests for towels and linens, room rentals by her trafficker with cash or debit while A.B. actually entered the room), Defendant Wyndham's hotel staff failed to recognize

or report Plaintiff's trafficking. When A.B. repeatedly returned to Wyndam's hotel following these common signs of trafficking, Defendant Wyndam's staff still failed to take any action to protect A.B.

110.     Through room rentals to her trafficker, Defendant Wyndham harbored or otherwise facilitated a sex trafficking venture on its hotel property and accordingly, benefited from the sex trafficking the Plaintiff suffered. Furthermore, Defendant Wyndham failed to prevent her continued victimization.

111.     Prior to, during, and following the incidents described herein, the Defendant had actual and/or constructive knowledge of drug dealing, prostitution, and/or general safety concerns at their hotels, including, but not limited to, video surveillance of its hotels, as well as oral or written complaints regarding said suspicious activity. Defendant Wyndham failed to take any actions to curtail these activities.

112.     Had Defendant Wyndham been paying attention to the activities being conducted at its hotel and on their properties, and the apparent red flags outlined above, it would have been impossible for them not to notice the victimization of A.B.

113.     The impact of being coerced and forced into sex trafficking at the Defendants' hotel properties has forever emotionally and physically injured A.B.

### D.  THE SEX TRAFFICKING OF A.B. AT THE RAMADA BY WYNDHAM

114.     From approximately November 2012 through March 2013, the Plaintiff was repeatedly subjugated to sex trafficking at the Ramada by Wyndham located at 6221 NE 82nd Ave, Portland, OR 97220.

115.     During the time she was sex trafficked, Plaintiff A.B. was coerced or forced into having sex with various buyers at Wyndham's hotels in response to advertisements for

FIRST AMENDED COMPLAINT          70

commercial sex that her trafficker posted on websites such as backpage.com, which may have included, but is not limited to, the following specific dates: December 16, 2012; December 19, 2012; December 26, 2012; February 5, 2013; February 7, 2013; February 19, 2013; and February 25, 2013 through February 27, 2013.

116.    When at the Ramada, Plaintiff A.B. was sold by her trafficker to  least 7 "clients" per night or until the night slowed down.

117.    Plaintiff's trafficker would book her at the Ramada by Wyndham anywhere from one (1) to four (4) nights at a time before rotating her to other hotels, and she would generally be placed at the Ramada by Wyndham up to two times in the same month, or 6 to 12 stays over 4 to 5 months.

118.    Wyndham's central reservation system would have shown the reservations made by her trafficker, a local resident, at both the Ramada and Days Inn hotels.

119.    A.B.'s trafficker, a local to the area, always booked and paid for the rooms directly from the front desk or online. He paid for the room using his debit card or cash.  After booking the room, her trafficker would get two keys and take one key to A.B., who would have to wait for him in the car. Each time, A.B. would walk to the room by herself, often through the front door and past the lobby, not having registered as a guest.

120.    Her trafficker would then re-enter the hotel and continue to book dates from the hotel area, including from his car where he would have sat for long periods of time or from the hot tub area at the hotel.

121.    During times she was with a "john," her trafficker would use the hotel's Wi-Fi to post advertisements on backpage and set up "dates" with "johns." Her trafficker would often also use the hotel's Wi-Fi to record the sex acts taking place with A.B. from inside the room.

FIRST AMENDED COMPLAINT          71

Upon information and belief, her trafficker used the hotel's Wi-Fi to connect his laptop to the laptop used to watch and record the sex trafficking of A.B. in her room.

122.    Upon information and belief, recordings of this nature would have signaled large amounts of data usage identifiable by the hotels directly by slowing and delays caused by the drag on connectivity throughout the hotel.

123.    Upon information and belief, the location of the computers involved in these recordings could be identified given the modems and access locations, which would be available and identifiable to the hotels and any third-party established to maintain and monitor Wi-Fi access.

124.    Each buyer entering the Ramada by Wyndham was a non-paying guest and left shortly after he arrived. Her trafficker would wait in the lobby or in the car while A.B. was sex trafficked at Defendant Wyndham's hotel.  The foot traffic to the rooms was constant and voluminous.  When the hotel doors were locked at night, Plaintiff A.B. would walk out to open the front lobby doors for unregistered men late at night without being questioned by any employee.

125.    Abundant condoms were scattered across various surfaces and visible to any hotel employee who entered the room.

126.    A.B. was told to avoid eye contact with hotel staff and to not to engage in conversation with anyone. Despite numerous surveillance cameras throughout the hotel, no help or attention was given to A.B. by any hotel staff.

127.    The Plaintiff encountered the same hotel staff over the course of time she was trafficked for sex at the Ramada by Wyndam.  Hotel staff were inadequately trained and unprepared to address the ongoing torture the Plaintiff endured while she was regularly

trafficked for sex at Wyndham's hotel.

128.    Despite signs of human trafficking on repeated occasions over five months (including, but not limited to, no eye contact and duration of stay) and indicators of commercial sex activity (bottles of lubricants, boxes of condoms, used condoms in the trash, excessive requests for towels and linens, room rentals by her trafficker with cash or debit while A.B. actually entered the room), Defendant Wyndham's hotel staff failed to recognize or report Plaintiff's trafficking. When A.B. repeatedly returned to Wyndam's hotel following these common signs of trafficking, Defendant Wyndam's staff still failed to take any action to protect A.B.

129.    Prior to, during, and following the incidents described herein, the Defendant had actual and/or constructive knowledge of drug dealing, prostitution, and/or general safety concerns at their hotels, including, but not limited to, video surveillance of its hotels, as well as oral or written complaints regarding said suspicious activity. Defendant Wyndam failed to take any actions to curtail these activities.

130.    Had Defendant Wyndam been paying attention to the activities being conducted at its hotel and on their properties, and the apparent red flags outlined above, it would have been impossible for them not to notice the victimization of A.B.

131.    The impact of being coerced and forced into sex trafficking at the Defendants' hotel properties has forever emotionally and physically injured A.B.

**E.   THE SEX TRAFFICKING OF A.B. AT THE RESIDENCE INN BY MARRIOTT**

132.    From approximately November 2012 through March 2013, the Plaintiff was repeatedly subjugated to sex trafficking at the Residence Inn by Marriott located at 9301 NE Cascades Parkway, Portland, Oregon 97220.

133.    During the time she was sex trafficked, Plaintiff A.B. was coerced or forced into having sex with various buyers at Marriott's hotels in response to advertisements for commercial sex that her trafficker posted on websites such as backpage.com, which may have included, but is not limited to, the following specific dates: December 16, 2012; December 19, 2012; December 26, 2012; February 5, 2013; February 7, 2013; February 19, 2013; and February 25, 2013 through February 27, 2013

134.    When at the Residence Inn, Plaintiff A.B. was sold by her trafficker at each hotel to least 7 "clients" per night or until the night slowed down.

135.    Plaintiff's trafficker would book her at the Residence Inn anywhere from one (1) to four (4) nights at a time before being rotated to other hotels, and would generally be placed at the Residence Inn up to two times in the same month, or 6 to 12 stays over 4 to 5 months. Specifically, but not limited to, Plaintiff recalls she was trafficked at the Residence Inn from February 28, 2013 through March 2, 2013; March 11, 2013 through March 12, 2013, and March 19, 2013 through March 21, 2013.

136.    A.B.'s trafficker, a local to the area, always booked and paid for the rooms directly from the front desk or online. He paid for the room using his debit card or cash and often booked the rooms using an employee discount code.  After booking the room, her trafficker would get two keys and take one key to A.B., who would have to wait for him in the car. Each time, A.B. would walk to the room by herself, often through the front door and past the lobby, not having registered as a guest.

137.    Her trafficker would then re-enter the hotel and continue to book dates from the hotel area, including the lobby, from his car where he would have sat for long periods of time, or from the hot tub area at the hotel.

FIRST AMENDED COMPLAINT            74

138.    Plaintiff's trafficker was also permitted to use an employee discount for the rooms he booked, obviously without being an employee--data which certainly would have been suspicious and known to Marriott through the central reservation system.

139.    During times she was with a "john," her trafficker would use the hotel's Wi-Fi to post advertisements on backpage and set up "dates" with "johns."   At the Residence Inn, her trafficker often reentered the hotel and set up in the hotel lobby to book additional "dates" or "Johns" and her trafficker would often also use the hotel's Wi-Fi to record the sex acts taking place with A.B. from inside the room he booked.

140.    Upon information and belief, recordings of this nature would have signaled large amounts of data usage identifiable by the hotels directly by slowing and delays caused by the drag on connectivity throughout the hotel.

141.    Upon information and belief, the location of the computers involved in these recordings could be identified given the modems and access locations, which would be available and identifiable to the hotels and any third-party established to maintain and monitor Wi-Fi access.

142.    Each buyer entering the Residence Inn by Marriott was a non-paying guest and left shortly after her arrived. Her trafficker would wait in the lobby or in the car while A.B. was sex trafficked at Defendant Marriott's hotel.  The foot traffic to the rooms was constant and voluminous.  When the hotel doors were locked at night, Plaintiff A.B. would walk out to open the front lobby doors for unregistered men late at night without being questioned by any employee.

143.    Abundant condoms were scattered across various surfaces and visible to any hotel employee who entered the room.

FIRST AMENDED COMPLAINT          75

144.    Plaintiff alleges that on at least two or more occasions, a room was rented at the Residence Inn by Marriott where she and another girl were forced to share a room. The Plaintiff and the other girl would alternate in and out of the room meeting "clients" or "dates" and neither one would leave the property.

145.    A.B. was told to avoid eye contact with hotel staff and to not to engage in conversation with anyone. Despite numerous surveillance cameras throughout the hotel, no help or attention was given to A.B. by any hotel staff.

146.    The Plaintiff encountered the same hotel staff over the course of time she was trafficked for sex at the Residence Inn by Marriott.  Hotel staff were inadequately trained and unprepared to address the ongoing torture the Plaintiff endured while she was regularly trafficked for sex at Marriott's hotel.

147.    Despite obvious signs of human trafficking, including but not limited to, (no eye contact and duration of stay) and indicators of commercial sex activity (bottles of lubricants, boxes of condoms, used condoms in the trash, excessive requests for towels and linens, room rentals by her trafficker with cash or debit while A.B. actually entered the room), rental by a man for a woman who did not enter the hotel at the same time, where consistent foot traffic was occurring, Defendant Marriott's hotel staff failed to recognize or report Plaintiff's trafficking. When A.B. repeatedly returned to Marriott's hotel following these common signs of trafficking, Defendant Marriott's staff still failed to take any action to protect A.B.

148.    Prior to, during, and following the incidents described herein, the Defendant had actual and/or constructive knowledge of drug dealing, prostitution, and/or general safety concerns at their hotels, including, but not limited to, video surveillance of its hotels, as well as oral or written complaints regarding said suspicious activity. Defendant Marriott failed to

take any actions to curtail these activities.

149.    Had Defendant Marriott been paying attention to the activities being conducted at its hotel and on their properties, and the apparent red flags outlined above, it would have been impossible for them not to notice the victimization of A.B.

150.    The impact of being coerced and forced into sex trafficking at the Defendants' hotel properties has forever emotionally and physically injured A.B.

### F.   THE SEX TRAFFICKING OF A.B. AT THE RED LION HOTEL

151.    From approximately November 2012 through March 2013, the Plaintiff was repeatedly subjugated to sex trafficking at the Days Inn by Wyndham located at 3301 Market Street NE Salem, Oregon 97301.

152.    During the time she was sex trafficked, Plaintiff A.B. was coerced or forced into having sex with various buyers at RLHC's hotels in response to advertisements for commercial sex that her trafficker posted on websites such as backpage.com, which may have included, but is not limited to, the following specific dates: December 16, 2012; December 19, 2012; December 26, 2012; February 5, 2013; February 7, 2013; February 19, 2013; and February 25, 2013 through February 27, 2013.

153.    When at the Red Lion Hotel, Plaintiff A.B. was sold by her trafficker to  least 7 "clients" per night or until the night slowed down.

154.    Plaintiff A.B. would stay at the Red Lion Hotel anywhere from one (1) to four (4) nights at a time before being rotated to other hotels, and would generally be placed at the Red Lion Hotel up to two times in the same month, or 6 to 12 stays over 4 to 5 months

155.    A.B. booked the rooms directly from the front desk or online and paid for each room using her debit card or cash, funded by her trafficker.

FIRST AMENDED COMPLAINT            77

156.    Plaintiff alleges that on at least two or more occasions, a room was rented at the Red Lion hotel where she and another girl were forced to share a room. The Plaintiff and the other girl would alternate in and out of the room meeting "clients" or "dates" and neither one would leave the property.

157.    During times she was with a "john," her trafficker would use the hotel's Wi-Fi to post advertisements on backpage and set up "dates" with "johns." Her trafficker would often also use the hotel's Wi-Fi to record the sex acts taking place with A.B. from inside the room. Upon information and belief, her trafficker used the hotel's Wi-Fi to connect his laptop to the laptop used to watch and record the sex trafficking of A.B. in her room.

158.    Upon information and belief, recordings of this nature would have signaled large amounts of data usage identifiable by the hotels directly by slowing and delays caused by the drag on connectivity throughout the hotel.

159.    Upon information and belief, the location of the computers involved in these recordings could be identified given the modems and access locations, which would be available and identifiable to the hotels and any third-party established to maintain and monitor Wi-Fi access.

160.    Each buyer entering the Red Lion hotel was a non-paying guest and left shortly after her arrived. The foot traffic to the rooms was constant and voluminous.  When the hotel doors were locked at night, Plaintiff A.B. would walk out to open the front lobby doors for unregistered men late at night without being questioned by any employee.

161.    Abundant condoms were scattered across various surfaces and visible to any hotel employee who entered the room.

162.    A.B.  was  told  to  avoid  eye  contact  with  hotel  staff  and  to  not  to  engage  in

FIRST AMENDED COMPLAINT          78

conversation with anyone. Despite numerous surveillance cameras throughout the hotel, no help or attention was given to A.B. by any hotel staff.

163.   The Plaintiff encountered the same hotel staff over the course of time she was trafficked for sex at the Red Lion hotel.  Hotel staff were inadequately trained and unprepared to address the ongoing torture the Plaintiff endured while she was regularly trafficked for sex at RLHC's hotel.

164.   Despite obvious signs of human trafficking (including, but not limited to, no eye contact and duration of stay) and indicators of commercial sex activity (bottles of lubricants, boxes of condoms, used condoms in the trash, excessive requests for towels and linens), Defendant RLHC's hotel staff failed to recognize or report Plaintiff's trafficking. When A.B. repeatedly returned to RLHC's hotel following these common signs of trafficking, Defendant RLHC's staff still failed to take any action to protect A.B..

165.   Prior to, during, and following the incidents described herein, the Defendant had actual and/or constructive knowledge of drug dealing, prostitution, and/or general safety concerns at their hotels, including, but not limited to, video surveillance of its hotels, as well as oral or written complaints regarding said suspicious activity. Defendant RLHC failed to take any actions to curtail these activities.

166.   Had Defendant RLHC been paying attention to the activities being conducted at its hotel and on their properties, and the apparent red flags outlined above, it would have been impossible for them not to notice the victimization of A.B.

167.   The impact of being coerced and forced into sex trafficking at the Defendants' hotel properties has forever emotionally and physically injured A.B.

### G.   THE DEFENDANTS FACILITATED THE TRAFFICKING OF A.B.

168.    Wyndham, Marriott, and RLHC ("Defendant Hotels") profited from the sex trafficking of A.B. and knowingly or negligently aided and engaged with her trafficker in his sex trafficking venture. The Defendants leased rooms to A.B.'s trafficker, when they knew, or should have known, that he was using their room to imprison A.B. and subject her to repeated exploitation as he forced her into sexual servitude.

169.    Defendant Hotels knew, or should have known, that A.B. was being trafficked and that the Defendants were knowingly benefiting financially from said exploitation, because A.B.'s trafficker frequented the Defendants' hotels.

170.    Defendant Hotels knew, or should have known, that A.B. was being trafficked because A.B. was arrested on property grounds, constantly entertained traffic to appease her traffickers' daily quotas, and her traffickers would help check her in then not proceed to the room; behavior that indicated they were using the Defendants' hotels for his illegal sex trafficking venture.

171.    Defendant Hotels actively participated in this illegal endeavor by knowingly or negligently providing lodging to A.B.'s trafficker in which to harbor A.B. while he was trafficking her.

172.    Defendant Hotels profited from the sex trafficking of A.B. and took no action as A.B. repeatedly visited each hotel, often with different guests, without any luggage, avoiding all eye contact, and exhibiting signs of malnourishment.

173.    Defendant Hotels actively participated in this illegal endeavor by knowingly or negligently providing lodging to those who purchased sex from A.B. in which to harbor A.B. while she was being trafficked for sex.

174.    The Defendant Hotels all had the opportunity to stop A.B.'s trafficker and offenders

like him from victimizing A.B. and others like her. Instead, every Defendant failed to take reasonable measures to stop sex trafficking from occurring in their hotels.

175.    The Defendant Hotels all financially benefited from the sex trafficking of A.B., and other victims like her, and developed and maintained business models that attract and foster the commercial sex market for traffickers and buyers alike.

176.    Defendant Hotels enjoy the steady stream of income that sex traffickers bring to their hotel brands, such as the Days Inn, Ramada, Residence Inn, and Red Lion.

177.    Defendant Hotels financially benefit from their ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

178.    Defendants have long been aware that free Wi-Fi is attractive to traffickers, yet failed to provide adequate security to protect Plaintiff, including adequate measures to monitor Wi-Fi access. The myriad types of electronically stored information ("ESI") generated in the use of a Wi-Fi network can manage and track communications and activity originating from devices granted access. By way of the ESI generated through the use of Defendants' Wi-Fi networks, Defendants had information in their custody, control, and possession that enabled them to identify the purpose for which their Wi-Fi network and their property were being used and by which they profited.

179.    Defendant Hotels failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on their properties.

180.    Defendant Hotels maintained their deficiencies to maximize profits by:

   a.    Reducing the cost of training employees and managers of how to spot the signs of human trafficking and sexual exploitation and what steps to take;

   b.    Lowering operating costs and management costs by not analyzing the data they

received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the issues at relevant locations or else hold the franchisee accountable and terminate their franchise agreement;

c. Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotels;

d. Not refusing room rentals, or reporting guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

e. Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers to actively combat human trafficking and sexual exploitation;

181.    As a direct and proximate result of these egregious practices on the part of the Defendant Hotels, A.B. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## CAUSES OF ACTION

### A. COUNT ONE – 18 U.S.C §1595 ("TVPRA")
### (Against all Defendants)

182.    The Plaintiff A.B. incorporates each foregoing allegation.

183.    A.B. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

184.    The Defendants' acts, omissions, and commissions, taken separately and/or

together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, the Defendants had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of 18 U.S.C. §1591 (a). At all relevant times, the Defendants breached this duty by participating in, and facilitating, the harboring and providing of A.B. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

185.   The Defendants have financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade. Moreover, the Defendants directly benefited from the trafficking of A.B. on each occasion they received payment for rooms that she was being kept in at the Defendants' hotels. The actions, omissions, and/or commissions alleged in this pleading were the but for and proximate cause of A.B.'s injuries and damages.

186.   A.B. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotels and properties in violation of 18 U.S.C. §1591(a).

## PRAYER FOR RELIEF

WHEREFORE the Plaintiff requests that the jury selected to hear this case render a verdict in her favor on all counts alleged, and against each and every named Defendant, separately and severally, and that it award damages to her in an amount which will adequately compensate her for the injuries and damages she sustained due to the Defendants' conduct outlined as follows:

a.   All available compensatory damages for the described losses with respect to

each cause of action;

b.   past and future medical expenses, as well as the costs associated with past and future life care;

c.   past and future lost wages and loss of earning capacity;

d.   past and future emotional distress;

e.   consequential and/or special damages;

f.   all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

g.   disgorgement of profits obtained through unjust enrichment;

h.   restitution;

i.   punitive damages with respect to each cause of action;

j.   reasonable and recoverable attorneys' fees;

k.   costs of this action; and

l.   pre-judgment and all other interest recoverable.

Also, on the basis of the foregoing, the Plaintiff requests that a jury be selected to hear this case and render a verdict for the Plaintiff, and against the Defendants, and that it award damages to the Plaintiff in an amount which adequately reflects the enormity of the Defendants' wrongs, and which will effectively prevent other similarly caused acts. Further, the Plaintiff requests that the Court enter judgment consistent with the jury's verdict, and prays for any other damages and equitable relief the Court or jury deems appropriate under the circumstances.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY**

Dated:  October 8, 2020                                    RESPECTFULLY SUBMITTED,

FIRST AMENDED COMPLAINT                     84

*/s/ Joel Shapiro*
Joel Shapiro, OSB #003814
Law Office of Joel Shapiro, LLC
1420 NW Lovejoy St, Suite 631
Portland, Oregon 97209
T: (971) 999-1889
E: joel@joelshapirolaw.com

*/s/ Kimberly Lambert Adams*
Kimberly Lambert Adams (*pro hac vice*)
FL Bar No. 0014479
Kathryn L. Avila (*pro hac vice*)
Levin, Papantonio, Thomas, Mitchell,
Rafferty & Proctor, P.A.
316 S. Baylen St. Suite 600
Pensacola, FL 32502
T: 850.435.7056
F: 850.436.6056
E: kadams@levinlaw.com /
kavila@levinlaw.com

*/s/ Shenoa Payne*
Shenoa Payne, OSB #084392
Shenoa Payne Attorney at Law PC
65 SW Yamhill St, Ste 300
Portland, Oregon 97204
T: (503) 914-2500
E: spayne@paynelawpdx.com

**Attorneys for Plaintiff**

FIRST AMENDED COMPLAINT          85